UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
LUCIA VLAD-BERINDAN,                                          :

                       Plaintiff,          :

          -against-                                  :

NYC METROPOLITAN TRANSPORTATION             :
AUTHORITY, MTA NEW YORK CITY TRANSIT,
MTA NEW YORK CITY TRANSIT AUTHORITY,        :
NEW YORK CITY TRANSIT,

                        :

                Defendants.

------------------------------------------------------------------------X

14cv10304 (VEC) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE VALERIE CAPRONI, U.S.D.J.:**

      This *pro se* employment discrimination and retaliation suit has been referred to this Court

to report and recommend on dispositive motions.  After earlier motion practice, what remains of

the case are the claims brought by plaintiff Lucia Vlad-Berindan ("Plaintiff") against defendants

MTA New York City Transit, MTA New York City Transit Authority, and New York City

Transit,[1] for unlawful retaliation under Title VII of the Civil Rights Act of 1964, as amended,

---

[1] Plaintiff has indicated that she intended to sue only two entities in this case, the NYC
Metropolitan Transportation Authority (the "MTA") and the entity commonly known as the New
York City Transit Authority.  (*See* Plaintiff's Statement of Material Facts on Cross-Motion for
Summary Judgment as To Which There is No Genuine Dispute, dated Mar. 10, 2017 ("Pl. 56.1
Stmt.") (Dkt. 121) ¶¶ 101-02.)  Plaintiff's claims against the MTA were dismissed by an earlier
Order of the Court (*see* Dkt. 46), although the Docket of this action does not reflect that
dismissal.  As for the New York City Transit Authority, it seems that Plaintiff was uncertain of
the correct name of that entity when she commenced this suit, and variously named it in this
action as "MTA New York City Transit," the "MTA New York City Transit Authority," and
"New York City Transit."  Given that the parties' most recent submissions seem somewhat
confused as to which parties remain in the case, I respectfully recommend that, if Plaintiff's
claims survive summary judgment, then the Clerk of Court be directed to correct the Docket to
indicate the termination of Plaintiff's claims against defendant MTA.  In any event, for purposes
of this Report and Recommendation, this Court will identify the remaining three defendants,
collectively, as "Defendants" or "NYCTA."

42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), and the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621 *et seq.* ("ADEA").  Specifically, Plaintiff claims that, following her completion of an unpaid paralegal internship, NYCTA reneged on its agreement to transition her to a paid paralegal consultant position (or simply failed to hire her for such a position, for which she purportedly was qualified and had applied), after having learned of, and in retaliation for, her having earlier filed an EEOC complaint and federal lawsuit against NYCTA and three individual defendants.

Currently before the Court is Defendants' motion for summary judgment (Dkt. 105), as well as Plaintiff's cross-motion for summary judgment and a default judgment (Dkt. 118), on Plaintiff's retaliation claims.  For the reasons that follow, I respectfully recommend that Defendants' motion be granted, that Plaintiff's cross-motion be denied, and that this case be dismissed, in its entirety, with prejudice.

## BACKGROUND

### A.   Factual Background[2]

This is the second federal lawsuit that Plaintiff has filed in this Court against NYCTA, during a period when Plaintiff was a student in a baccalaureate paralegal program at the New York City College of Technology ("City Tech").  She filed the first suit in 2013 (also naming certain individuals as defendants), claiming that NYCTA had denied her both an initial position

---

[2] As discussed *infra* (*see* Discussion, at Section II(B)(1)),  Plaintiff has failed either (a) to respond adequately to the Statement of Material Facts that Defendants submitted with their motion in accordance with Local Civil Rule 56.1, or (b) to submit a proper Rule 56.1 Statement in support of her cross-motion.  For its part, NYCTA has provided no opposition to Plaintiff's deficient Rule 56.1 Statement.  Under the circumstances, the facts summarized herein are derived from the underlying discovery record and the parties' submitted affidavits and declarations.

as a paralegal intern and a subsequent position as a paid "paralegal-contractor," for discriminatory reasons.  Despite the fact that Plaintiff was denied those positions (and filed suit over it), she nevertheless accepted the advice of Professor Gail E. Williams, who oversaw her second internship and seminar class in the City Tech program, that she should reapply for a spring 2014 position as a paralegal intern in NYCTA Law Department's Torts Division.  In the present action, the parties do not dispute that Plaintiff applied for and was accepted for that internship, and that she proceeded to serve as a paralegal intern for NYCTA for approximately six weeks in March and April 2014.  What *are* disputed are Plaintiff's contentions that, at the same time that she was accepted for the 2014 internship, she also applied for a paid paralegal consultant position, to commence after the internship ended, and that she was offered and accepted that position.  As set out in more detail below, Plaintiff was ultimately not afforded an opportunity to work in such a paid position, and in this – her second – lawsuit, she claims that she was denied that opportunity in retaliation for having filed her earlier discrimination suit.

### 1. Plaintiff's Enrollment in the Law and Paralegal Studies Program at City Tech

Following receipt of a paralegal associate's degree at LaGuardia Community College in 2013, Plaintiff transferred to City Tech to complete a baccalaureate program in Law and Paralegal Studies.  (Declaration of James J. Gallagher, Esq., dated Dec. 21, 2016 ("Gallagher Decl.") (Dkt. 110), Ex. T, at 26-27; *see also* Defendants' Statement of Material Facts Pursuant to Rule 56.1, dated Dec. 21, 2016 ("Def. 56.1 Stmt.") (Dkt. 106) ¶ 31; Pl. 56.1 Stmt. ¶ 270.)  As not all of Plaintiff's credits were accepted from LaGuardia Community College, Plaintiff was required to take an internship class, known as "Internship I," taught by Professor Williams in the spring of 2013, with which Plaintiff's initial EEOC charge and lawsuit against NYCTA (the "Prior Action") were associated.  (*See* Pl. 56.1 Stmt. ¶¶ 276, 286; Declaration of Lucia Vlad-

3

Berindan, dated Mar. 10, 2017 ("Vlad-Berindan Decl."), Ex. 30 (undated "Statement of Requirements Form," indicating that Plaintiff needed to complete Internship I).)  Plaintiff ultimately completed Internship I, by serving as an intern at the firm Pacheco & Lugo. (Gallagher Decl., Ex. T, at 38.)  As part of the City Tech program, Plaintiff enrolled the following year in a second, elective internship and seminar class, known as "Internship II," also taught by Professor Williams.  (*See id.*, at 36; *see also* Def. 56.1 Stmt. ¶ 32; Pl. 56.1 Stmt. ¶ 285; Vlad-Berindan Decl., Ex. 18.)  In order to satisfy requirements for the class, Plaintiff was required to complete an 120-hour internship, which Plaintiff ultimately completed at NYCTA. (*See* Pl. 56.1 Stmt. ¶¶ 14, 345.)

### 2.    Plaintiff's 2013 Charge of Discrimination

Plaintiff's earlier complaints of discrimination by NYCTA arose in 2013, and, on or about September 6, 2013, she lodged a complaint with the EEOC, asserting that NYCTA had discriminated against her in violation of Title VII, the ADA, and the ADEA, on the basis of her race, color, national origin, age, and disability.  (Gallagher Decl., Ex. D, at 1-2; Def. 56.1 Stmt. ¶ 112; *see generally* Pl. 56.1 Stmt. ¶¶ 285-83.)

Plaintiff attached, to the EEOC charge, a summary of her complaints.  (*See* Gallagher Decl., Ex. D, at 3-5.)  Based on that summary, Plaintiff had allegedly sought an internship at NYCTA by telephone on February 12, 2013, and, the following day, she was interviewed separately by three non-white attorneys.  (*Id.*, at 3; Pl. 56.1 Stmt. ¶ 279.)  Plaintiff's first interview, with an unnamed interviewer, was without incident.  (*See* Gallagher Decl., Ex. D, at 3.)  During her second interview, with Marie Stanley, Esq. ("Stanley"), Stanley explained that a paralegal internship position, as well as a paid "paralegal-contractor" position were open, and asked Plaintiff whether she would be interested in assuming the paralegal-contractor position

following the paralegal internship.  (*Id.*)  Plaintiff allegedly informed Stanley that she was interested in the position, but could "work only [a] few hours a day" and could not "lift heavy things" due to certain disabling conditions.  (*Id.*)  During Plaintiff's third and final interview, an unnamed interviewer allegedly inquired as to Plaintiff's country of origin, and also asked if she would be willing to work as a paralegal-contractor following her internship "because if not, he told [her] he [would be] mad," given that a previous intern, after receiving internship training, had "left for a better paid job."  (*Id.*, at 3-4.)  Plaintiff allegedly never heard back from NYCTA regarding the paralegal internship or contractor position, and concluded that, "[p]resumably, . . . the three lawyers/interviewers decided that [she] was not good enough for them because [she] was too white, too blonde, . . . over 40 years old, too weak/disabl[ed], and too Romanian to work-learn-practice" at NYCTA.  (*Id.*, at 4.)

On October 28, 2013, the EEOC informed Plaintiff by letter that it could "not conclude that [Plaintiff had been] subjected to an adverse employment action motivated by discriminatory animus," and that Plaintiff's charge would be dismissed.  (Vlad-Berindan Decl., Ex. 1, at 1.)  The letter enclosed a "Dismissal and Notice of Rights" form, informing Plaintiff of her right to sue within 90 days of receipt of the notice.  (Gallagher Decl., Ex. C, at 15; *see also* Def. 56.1 Stmt. ¶¶ 4, 111, 116.)  On January 24, 2014, Plaintiff duly filed the Prior Action in this Court against "MTA NEW YORK CITY TRANSIT," Stanley, and a John and "Jean" Doe, alleging, *inter alia*, violations of Title VII, the ADA, the ADEA, and the Rehabilitation Act of 1973, 29 U.S.C. §§ 710 *et seq.*  (*See generally* Gallagher Decl., Ex. C; *see also* Def. 56.1 Stmt. ¶ 117; Pl. 56.1

Stmt. ¶ 284.)  Plaintiff's allegations in the lawsuit bore significant similarity to the allegations

she had raised before the EEOC.  (*See* Gallagher Decl., Ex. C, ¶ 22.)[3]

### 3. Plaintiff's Application for a Spring 2014 NYCTA Internship

In 2014, Plaintiff received from Professor Williams contact information (but not the firm

or agency affiliations) for a few internship opportunities, including a telephone number for

Miriam Bonett Waters ("Waters"), who served as NYCTA Assistant General Counsel and

supervisor of the Queens/Richmond Trial Unit in the NYCTA Torts Division.  (Gallagher Decl.,

Ex. T, at 29-30, 33; *see also* Def. 56.1 Stmt. ¶¶ 33-36; Gallagher Decl., Ex. O (copy of Post-It

note with Waters' name and telephone number); Vlad-Berindan Decl., Ex. 3 (same); Affidavit of

Miriam Bonett Waters, sworn to Dec. 20, 2016 ("Waters Aff.") (Dkt. 107) ¶ 1.)

Plaintiff attempted to call Waters on a few occasions in February 2014, and ultimately

had a telephone conversation with her on February 13, 2014.  (Gallagher Decl., Ex. T, at 34-36,

41-42; *see also* Def. 56.1 Stmt. ¶¶ 11, 37-38.)  According to Plaintiff, she called the telephone

number for Waters, "not knowing that [Waters was] an employee of the same Defendants [that]

discriminated [against] her a year before," and in fact, "not actually knowing at all with what

corporation . . . she would speak to."  (Pl. 56.1 Stmt. ¶ 17.)  At a deposition conducted in this

action on June 22, 2016, Plaintiff testified that, during the telephone call, Waters told her that

NYCTA had no internship positions available, but that NYCTA "[had] an opening for a

paralegal contractor [paid at a rate of] $10 per hour."  (Gallagher Decl., Ex. T, at 46; *see also*

Def. 56.1 Stmt. ¶¶ 12, 40, 42; Pl. 56.1 Stmt. ¶¶ 18-19.)  Plaintiff further testified that she had

---

[3] Plaintiff's Prior Action was eventually dismissed without prejudice to amend (*see* Dkt. 28 in Case No. 14cv00675 (RJS)), and, after Plaintiff failed to file a timely motion to amend, the matter was closed on January 30, 2015.

6

informed Waters that Professor Williams had provided her with Waters' contact information, that Plaintiff was "a qualified paralegal," that she held an associate's degree, and that she was "interested in having a job." (Gallagher Decl., Ex. T, at 47.) Plaintiff testified, however, that she also "told [Waters] very clearly that [she could] do the work but [that she] had to do first [sic] 120 [internship] hours . . . because [she] was enrolled in that [internship] class." (*Id.*; *see also* Def. 56.1 Stmt. ¶¶ 13, 43.) According to Plaintiff, "knowing this" information, Waters "told [Plaintiff] that [she] should e-mail [Waters] [her] resume." (Gallagher Decl., Ex. T, at 47; *see also* Pl. 56.1 Stmt. ¶ 19; Def. 56.1 Stmt. ¶ 14; *id.* ¶ 44 (Defendants characterizing Plaintiff's account by stating that, "[d]uring the call, . . . Waters invited Plaintiff to send her resume via e-mail for an internship position").)

Although Plaintiff initially testified that she had fully "described the conversation that [she] had" with Waters (Gallagher Decl., Ex. T, at 47), she later testified, at a continued deposition on July 1, 2016, that, after she had explained that she was qualified for the paralegal contractor position, Waters "told [her], 'you know something, e-mail me your resume and I will see'" (*id.*, at 81; *see also id.*, at 88). In response to Defendants' questioning, Plaintiff further testified that, in her view, Waters "couldn't offer . . . a job or an internship position after five minutes . . . of words in a phone conversation, and before she had [Plaintiff's] resume." (*Id.*, at 89.) Plaintiff added, however, that "because [Waters] asked [her for] the resume, it was implied that [Waters was] going to offer [Plaintiff] that [paid] job." (*Id.*) Plaintiff admitted, though, that Waters did not ask Plaintiff for a writing sample or references. (*Id.*) Plaintiff testified that, during the course of the phone call, she did not inform Waters that she had applied for a NYCTA internship the year prior, nor did she inform Waters that she had recently filed the Prior Action against NYCTA. (*Id.*, at 106; *see also* Def. 56.1 Stmt. ¶ 45.)

Following the telephone call, Plaintiff e-mailed Waters, also on February 13, 2014.  (*See* Gallagher Decl., Ex. T, at 20, 47, 81-82; *see also id.*, at 42 (testifying that, "[y]es," her e-mail "confirm[ed] [the] conversation [she] had with [Waters] on February 13, 2014"); Def. 56.1 Stmt. ¶¶ 14, 46; Gallagher Decl., Ex. G (copy of February 13, 2014 e-mail to Waters); Vlad-Berindan Decl., Ex. 4 (same).)  The subject line of Plaintiff's e-mail read "Seeking Paralegal Internship Position."  (Gallagher Decl., Ex. G; Vlad-Berindan Decl., Ex. 4.)  In the body of the e-mail, Plaintiff noted her enrollment in the internship class, and stated that she was "interested to do [her] 120 hours of internship in a law office . . . offering equal employment opportunity." (Gallagher Decl., Ex. G; Vlad-Berindan Decl., Ex. 4; *see also* Def. 56.1 Stmt. ¶ 47 (noting Plaintiff's e-mail statements); Pl. 56.1 Stmt. ¶ 298.)  Plaintiff attached her resume to the e-mail, stating that it showed that Plaintiff "[had] an AAS degree in Paralegal Studies" as well as "vast experience in different fields."  (Gallagher Decl., Ex. G; Vlad-Berindan Decl., Ex. 4.)

NYCTA concedes that Plaintiff sent the e-mail to Waters, describing it merely as "reiterating [Plaintiff's] interest in an internship position and attach[ing] her resume."  (Def. 56.1 Stmt. ¶ 46.)  Plaintiff disputes Defendants' narrow characterization of her e-mail, stating that the subject line of her e-mail was only intended to emphasize that Plaintiff needed to complete an internship prior to beginning a paid position.  (Pl. 56.1 Opp. ¶ 47; *id.* ¶ 297 (stating that Plaintiff used this subject line to remind Waters that she needed to complete an internship "first").) Further, Plaintiff states that the e-mail's text, emphasizing that she held an AAS degree – a requirement for a paid position – was meant to express her interest in such a position.  (*See id.*; *see also* Pl. 56.1 Stmt. ¶ 299 ("Although for an intern . . . position the paralegal qualification . . . was unnecessary and not requested," Plaintiff included information regarding her AAS degree "to remind [Waters] that [Plaintiff was] a qualified paralegal" for the open job position.).)

According to Plaintiff, as Waters had expressed over the telephone that no internship positions were available, Plaintiff "would be not [sic] invited for an interview" without "proving that [she] was a qualified paralegal." (*Id.*)

### 4.  NYCTA's Processes for Selecting Interns and Hiring Paralegal Consultants

According to Defendants, student intern positions in NYCTA's Torts Division "are not formally posted or advertised," and such opportunities are only made available when a Torts Division attorney expresses interest in hosting an intern. (Def. 56.1 Stmt. ¶ 133 (citing Waters Aff. ¶ 25); Pl. 56.1 Stmt. ¶ 85.)[4]  Waters has stated by affidavit that she is "responsible for the . . . informal process of hosting college student interns," and is contacted by students interested in an internship after their having received her contact information through their schools. (Waters Aff. ¶¶ 1, 25.)  After soliciting resumes from interested students, Waters forwards the resumes "to the attorneys in [her] Unit," and inquires as to whether any attorney is interested in hosting an intern, in which case, an interview with the student is scheduled. (*Id.* ¶¶ 27-28; *see also* Def. 56.1 Stmt. ¶ 134.)  Selected candidates are offered internship positions, and, other than completing "any paperwork or evaluations that a student may require to receive credit . . . there are no formal approvals or justifications required to host a student intern." (Waters Aff. ¶¶ 29-30; *see also* Def. 56.1 Stmt. ¶ 135.)

Defendants assert that, in contrast, NYCTA's "Torts Division uses very different processes for hiring paid paralegal consultants." (Def. 56.1 Stmt. ¶ 120; *see also* Waters Aff. ¶ 6.)  Waters has explained that, in addition to her role in hosting interns, she is responsible for

---

[4] Plaintiff disputes this, citing to an MTA website screenshot, dated April 29, 2016, offering paralegal internships to students "majoring in paralegal studies." (Vlad-Berindan Decl., Ex. 46, at 1; *see also* Pl. 56.1 Stmt. Opp. ¶ 132.)  Waters' affidavit, however, does state that the more informal process she describes was conducted "[i]n the past." (Waters Aff. ¶ 25.)

9

"interviewing, selecting, and processing candidates for part-time paralegal consultant positions in the Queens/Richmond Trial Unit."  (Waters Aff. ¶ 4.)  Openings for paralegal consultant positions are generally posted in local educational institutions, including City Tech.  (Def. 56.1 Stmt. ¶ 121; *see also* Waters Aff. ¶ 8.)  Those postings take two different forms, with the "main difference" being the role's time commitment.  (Def. 56.1 Stmt. ¶ 122; *see also* Waters Aff. ¶ 8; Gallagher Decl., Ex. P (two paralegal consultant job postings, one for a position requiring "approximately 23-28 hours per week," and a second for a position requiring "approximately 35 hours per week").)[5]  Interested candidates are invited to submit their resumes, and those selected for interviews are also required to provide references.  (Def. 56.1 Stmt. ¶ 123; *see also* Waters Aff. ¶¶ 9, 11.)

According to Defendants, after all paralegal consultant candidates have been interviewed by a panel of attorneys, a single candidate is chosen, whose references are then checked. (Def. 56.1 Stmt. ¶ 124; *see also* Waters Aff. ¶ 12.)  An "Applicant Flow Data Report" ("AFDR") is then created.  (Def. 56.1 Stmt. ¶ 125; *see also* Waters Aff. ¶¶ 12-13; Gallagher Decl., Ex. Q (sample AFDR, which includes, *inter alia*, information regarding the candidates interviewed and the selected candidate, and which attorneys performed the interviews and reference check).)

At that point, the selected candidate is interviewed again by the Deputy Executive Assistant General Counsel.  (Def. 56.1 Stmt. ¶ 126; *see also* Waters Aff. ¶ 14.)  If the interview goes well, the candidate is then sent a retainer agreement to review and sign, which is then counter-signed by the Deputy Executive Assistant General Counsel.  (Def. 56.1 Stmt. ¶ 127; Waters Aff. ¶ 14; *see also* Gallagher Decl., Ex. R (sample "Temporary Professional Services

---

[5] Each job posting indicates that a paralegal consultant position requires "at least 64 credits, an Associates Degree, or a Paralegal Certificate."  (Gallagher Decl., Ex. P.)

Paralegal Retainer Agreement").)  "Simultaneously, a document called a Procurement

Justification Form," setting forth a written justification for retaining the paralegal consultant, is

circulated to "an executive-level manager in Torts (the Deputy Executive Assistant General

Counsel), Law's Director [sic], Budget & Personnel, and the General Counsel" for their approval

and signatures.  (*See* Def. 56.1 Stmt. ¶¶ 128-29; *see also* Waters Aff. ¶¶ 17-19; Gallagher Decl.,

Ex. S (collection of 23 executed Procurement Justification Forms).)  After the Procurement

Justification Form has been executed by all required parties from the Law Department, it is

"forwarded to the Transit Authority's procurement division for approval."  (Def. 56.1 Stmt.

¶ 130; *see also* Waters Aff. ¶ 20; Affidavit of Samuel Schaffner, Chief Officer of Procurement,

Cost, Price, and Policy, sworn to Dec. 20, 2016 ("Schaffner Aff.") (Dkt. 108) ¶¶ 1, 9.)  The

paralegal consultant hiring process is only complete once the Procurement Justification Form has

been executed by all required parties from the Law Department and from Procurement.

(Def. 56.1 Stmt. ¶ 131; *see also* Waters Aff. ¶ 21; Schaffner Aff. ¶ 11.)  Defendants contend that

the above process is "always followed" when hiring a paralegal consultant, "and documents

produced establish that [from 2011 to 2015], 23 new contract paralegals [had] been hired" using

this process.  (Def. 56.1 Stmt. ¶ 132; *see also* Gallagher Decl., Ex. S (collection of 23 executed

Procurement Justification Forms dating from 2011 to 2015); Schaffner Aff. ¶ 11.)[6]

---

[6] Plaintiff asserts, in her Rule 56.1 Statement, that Defendants' evidence regarding the formal process used for hiring paralegal consultants is "irrelevant," as "Plaintiff did not claim or . . . [imply] that a retainer or any processing for her hiring was made by Defendants' employee[s]."  (Pl. 56.1 Stmt. ¶¶ 343-44.)  Rather, Plaintiff asserts that these were formalities to be completed at the end of the internship, and that, if Waters had not retaliated against her for filing the Prior Action, at the conclusion of Plaintiff's internship, she "would [have] asked Plaintiff for her references, and continued the hiring processing as she did" with others.  (*Id.* ¶ 348.)

**5.    Plaintiff's Interview and Selection as an Intern,
and Her Professed Understanding as to Whether
<u>She Was Also Being Hired for a Paid Position Thereafter</u>**

In this instance, following her receipt of Plaintiff's e-mail and resume, Waters forwarded

those materials to Stanley on February 14, 2014, asking, "Are you interested?"  (Gallagher Decl.,

Ex. H, at 1.)  On February 21, 2014, Waters forwarded Plaintiff's e-mail to seven additional

attorneys, asking them to "call [her] right away if you are interested in considering [Plaintiff] for

a Spring (2014) internship."  (*Id.*, at 2; *see also* Vlad-Berindan Decl., Ex. 7 (same).)  On

February 23, 2014, Melinda Alexis-Hayes, Esq. ("Alexis-Hayes") replied, expressing interest,

and Waters then asked her when she would be available to conduct an interview.  (Gallagher

Decl., Ex. H, at 3.)  Although Plaintiff's interview was apparently initially scheduled for

March 3, 2014, Waters rescheduled the interview to March 7, 2014, noting in an e-mail that

"Ms. Vlad will be coming here for an interview (Paralegal Intern) with Melinda on Friday,

March 7, 2014."  (Gallagher Decl., Ex. I, at 1; *see also* Def. 56.1 Stmt. ¶¶ 48-49; Pl. 56.1 Stmt.

¶ 300.)  At her deposition, Plaintiff testified that she "received a phone call that [she] was

accepted for the internship," or rather, as she then attempted to clarify, that she "was accepted

and was going to have an interview."  (Gallagher Decl., Ex. T, at 82.)

On March 7, 2014, Plaintiff was interviewed by a panel of attorneys, including Waters,

Alexis-Hayes, Celeste Redmond-Smith, Esq. ("Redmond-Smith"), and Samuel Cheng, Esq.

("Cheng").  (Gallagher Decl., Ex. T, at 55-56, 60, 97; Def. 56.1 Stmt. ¶¶ 15, 57, 59; Pl. 56.1

Stmt. ¶¶ 27, 303.)  Plaintiff brought her resume and a packet of blank forms, known as an

"internship employer packet," that required completion to satisfy her City Tech internship

requirements.  (Gallagher Decl., Ex. T, at 57-58; Def. 56.1 Stmt. ¶ 58.)  Waters was not present

for the entire interview, "going in and out," as she "had some other important things to do,"

12

although the other attorneys were present for the entire interview.  (Gallagher Decl., Ex. T, at 60-61; *see also* Def. 56.1 Stmt. ¶ 59; Pl. 56.1 Stmt. ¶¶ 27, 303.)

According to Plaintiff, Redmond-Smith led the interview, and asked the most questions, including questions about Plaintiff's "background" and experience.  (*See* Gallagher Decl., Ex. T, at 61-62, 99.)  Plaintiff testified that Redmond-Smith asked her what she would like to learn during the interview, and that Plaintiff responded only that she would like to "see how it is in the real world."  (*Id.*, at 62.)  Plaintiff also testified, however, that she had prior paralegal experience, and that she had already told Redmond-Smith "that [she] was a qualified paralegal and [thus didn't] have any objective to learn anything."  (*Id.*; *see also* Def. 56.1 Stmt. ¶ 66.)  In fact, she testified that the three objectives listed on one of her internship packet forms, including, for example, "conduct discovery and motion practice," were actually conceived of and written down by Redmond-Smith, not Plaintiff.  (Gallagher Decl., Ex. T, at 62-64, *see also id.*, Ex. N, at 9 (completed "Internship Learning Plan," signed by Redmond-Smith).)  Plaintiff further testified that she did not recall telling the interviewers that she had previously applied for an internship with NYCTA, and that she did not tell them that she had recently filed the Prior Action.  (Gallagher Decl., Ex. T, at 107; *see also* Def. 56.1 Stmt. ¶¶ 17, 71.)

With respect to whether the interview was for a paid position, as well as an internship, Plaintiff conceded at her deposition that, during the interview, she was not told explicitly that she was being offered a "paid internship."  (Gallagher Decl., Ex. T, at 105; *see also id.* ("Yes, of course, I was not offered anything clearly.  Actually, I was told that they [were] going to talk and they [were] going to inform me about their position."); Def. 56.1 Stmt. ¶¶ 16, 69-70.)  She contends, however, that "it was implied" that NYCTA was interviewing her for a position as a paid paralegal.  (Gallagher Decl., Ex. T, at 138.)  In this regard, Plaintiff testified that she was

13

told that the interviewers "had reviewed [her] resume" and were aware of her "request about the internship before the job position." (Gallagher Decl., Ex. T, at 99.) Plaintiff also testified that "it was very clear that [she] was invited for the interview for the internship and immediately after for the job position," as she had informed Waters during their initial telephone call that she was interested in both opportunities. (*Id.*, at 89.)

At certain points in her submissions, Plaintiff goes so far as to suggest that Waters' receipt of her resume, and subsequent scheduling of an interview, meant that Waters was willing to offer her the opportunity to interview for a specially-created internship position to be followed by a paid position. (*See, e.g.*, Pl. 56.1 Stmt. ¶ 23 ("Taking into consideration that . . . Waters had **no** intern position . . . ., the only reason [Waters] invited Plaintiff for an interview . . . was that, . . . Plaintiff accepted her $10/hr offer, and [Waters] received her Resume, [thereby] also accepting Plaintiff's special request for the internship first," then a paid position); *id.* ¶ 346 ("Because [Waters] asked Plaintiff to sen[d] her her resume, and after she received the email . . . and her resume[, reflecting] her Associate Degree in Law and Paralegal Studies and work experience," Plaintiff was subsequently invited for an interview, even though no intern positions were open, this "meant that [Waters] accepted Plaintiff's condition [of] 'either internship first and $10/hr paralegal-contractor job after [sic].'").)

Further, the interviewers' questions, which Plaintiff described as being "general," were, in her view, "most likely" related to the "[paid] position [and] not for the internship, because [NYCTA] didn't have an internship position." (Gallagher Decl., Ex. T, at 100.) According to Plaintiff's testimony, she also believed that NYCTA was interested in onboarding her for a paid position based on Waters' interview request that she "work five days a week, in order to finish as soon as possible the internship," to which Plaintiff responded that she could only work three days

14

a week during the school year, but after that would "probably . . . be able to work full-time." (*Id.*; *see also id.*, at 101, 133, 136-37; Pl. Stmt. 56.1 ¶ 307; Vlad-Berindan Decl. ¶ 26 & Ex. 26 (attaching Redmond-Smith's interview notes and emphasizing notation (not emphasized in the notes themselves) that Plaintiff was "looking for pre-trial **work**").)  Plaintiff further testified that, as Waters and Redmond-Smith had "asked [her] if [she knew] how much [she would] be paid," the interview must have been conducted for purposes of hosting Plaintiff for an internship and hiring her for a paid position thereafter.  (*See* Gallagher Decl., Ex. T, at 99, 104-05, 138; *cf.* Def. 56.1 Stmt. ¶ 16 ("Though [Plaintiff] recalled that there was a brief comment on how much contract paralegals were paid, the paralegal consultant position was not specifically discussed during the interview.").)

Overall, Plaintiff testified that it was "very clear it was implied during the interview" that she was being interviewed for the paid position, "because when [she was] invited for an interview and [was] asked how much [she was] going to be paid," "everything [was] implied and . . . leading [her] to the conclusion that [she was] going to be paid."  (Gallagher Decl., Ex. T, at 138.)  Plaintiff also contends that, as the "March 7, 2014 interview . . . was a follow-up" of Plaintiff's February 13, 2014 telephone call with Waters, "no additional discussion" was needed regarding the "terms" of a paralegal consultant position, such that Redmond-Smith's query "about if Plaintiff knew how much she [would] be paid" merely sought "reconfirmation" regarding the parties' agreement.  (Pl. 56.1 Stmt. ¶ 308.)

Plaintiff acknowledged at her deposition that, on March 10, 2014, shortly after the interview, Redmond-Smith "contact[ed] [her] by telephone and advised [her] that [she was] accepted to be an intern" at NYCTA.  (Gallagher Decl., Ex. T, at 59, 130; *see also* Def. 56.1 Stmt. ¶¶ 18, 72-73.)  Plaintiff, however, disputes NYCTA's characterization of her testimony in

its Rule 56.1 Statement, wherein NYCTA describes Plaintiff as having testified that "she received a phone call Redmond-Smith, who advised [P]laintiff that she was being offered a student internship position."  (Def. 56.1 Stmt. ¶ 72.)  Plaintiff calls Defendants' statement "vague" and "ambiguous," contending, without citing to evidentiary support, that Defendants' statement neglects to mention that the paralegal consultant position that Plaintiff was allegedly offered "was still under a retainer until April 4, 2014" for another employee,[7] and that it was therefore "obvious that the [phone call] and e-mail [were] only about [the] internship position created for Plaintiff as part of the deal 'internship first, then job position,'" and naturally did not address the paid position.  (Pl. 56.1 Opp. ¶ 72; *see also* Pl. 56.1 Stmt. ¶ 312 ("On March 10 Plaintiff was informed that Defendants accepted Plaintiff's condition 'internship 120 hours first and then the job position' and they agreed to create" an internship position for Plaintiff, an offer which Plaintiff "accepted.").)

In an e-mail dated March 10, 2014, to Waters, Alexis-Hayes, and Cheng, Redmond-Smith wrote:  "I spoke with Ms. Vlad-Berindan this afternoon and she has accepted our offer of an internship position."  (Gallagher Decl., Ex. J, at 1.)  On the next day, March 11, 2014, Redmond-Smith e-mailed Waters, advising her that Plaintiff would be "working 3 full days per week," for the six weeks from March 18, 2014 to April 25, 2014; that, during the first three weeks, Plaintiff would "work with" Alexis Hayes; and that, during the final three weeks, she would "work with" Redmond-Smith.  (Vlad-Berindan Decl., Ex. 28; *see also* Pl. 56.1 Stmt. ¶¶ 313, 319, 320 (emphasizing that Redmond-Smith's e-mail did not refer to Plaintiff "interning" or "learning" from these individuals, but rather, to "working" with them).)  In addition,

---

[7] *See* Background, *infra*, at Section A(9) (regarding Plaintiff's naming of Barbara Wheatle as having previously held the paralegal consultant position that Plaintiff believed she had been offered).

16

Redmond-Smith stated in her e-mail, "I have spoken with Mona [Einbinder ("Einbinder")] and she has agreed to sit with [Plaintiff] when she begins . . . [to] give her an overview of paralegal work, pleadings, discovery and how to break[]down a file."  (Gallagher Decl., Ex. J, at 4.)[8]

### 6. Plaintiff's Performance in the Spring 2014 NYCTA Internship

According to Defendants, "Plaintiff interned at the Transit Authority for six weeks, largely without incident."  (Def. 56.1 Stmt. ¶ 19.)  A document submitted by Plaintiff, entitled "Lucia Vlad-Berindan Time Log Paralegal Intern [NYCTA] Spring 2014," evidences that Plaintiff worked three days a week, from 9:00 a.m. to 5:00 p.m., with seven of those hours per day counted as working hours, and that her last day of work was not April 25, 2014, as planned, but April 29, 2014, as Redmond-Smith was unavailable to complete Plaintiff's internship paperwork on April 25, 2014.  (Vlad-Berindan Decl. ¶ 15 & Ex. 15; Pl. 56.1 Stmt. ¶ 327.)  Plaintiff testified that, during the first weeks of her internship, when she was working with Alexis-Hayes, Plaintiff drafted a memorandum summarizing a case file, which identified certain major deficiencies in the plaintiffs' case.  (Gallagher Decl., Ex. T, at 112-14; *see also* Def. 56.1 Stmt. ¶¶ 76-77; Vlad-Berindan Decl., Ex. 32 (copy of memorandum).)  According to Plaintiff, Alexis-Hayes was "very happy," as she took Plaintiff's advised positions during a court appearance, and the appearance had gone well.  (Gallagher Decl., Ex. T, at 113-14; *see also* Pl.

---

[8] Plaintiff asserts, in her Declaration, that the references to her "working" with certain individuals establish that "Plaintiff was accepted as an intern only because of her special request . . . but in fact she was accepted to work and not to 'learn' anything as interns [do]." (Vlad-Berindan Decl. ¶ 28.)  Further, Plaintiff asserts that Redmond-Smith's scheduling of an "overview" with Einbinder amounted to Redmond-Smith having scheduled Plaintiff for "a very brief orientation like a pro and not for [an] intern-learner."  (*Id.*)  Plaintiff also offers an exhibit, apparently a one-page sheet summarizing her contact information and work station assignment, entitled "Position:  Spring 2014 Paralegal Intern," emphasizing, in her Declaration, that the form indicated that Plaintiff would be "**work[ing]**" with certain attorneys.  (Vlad-Berindan Decl. ¶ 14 (emphasis in original) & Ex. 14.)

17

56.1 Stmt. ¶ 322.)  Plaintiff also completed a variety of other assignments for Alexis-Hayes, and stated generally that Alexis-Hayes was happy with her work and did not have any disagreements with her.  (Gallagher Decl., Ex. T, at 116; *see also id.*, at 122 (stating that Alexis-Hayes was "a very nice person," and that "it was [a] pleasure to work with her"); Def. 56.1 Stmt. ¶ 79; Pl. 56.1 Stmt. ¶ 323.)

 After Plaintiff's time working with Alexis-Hayes, Plaintiff began working with Redmond-Smith and also accepted spot assignments from other attorneys.  (Gallagher Decl., Ex. T, at 116; Def. 56.1 Stmt. ¶ 80.)  Plaintiff testified that Redmond-Smith told her that she (Redmond-Smith) had a "very, very heavy case," and asked Plaintiff to organize the case file, as well as to take a "fresh look" at the case.  (Gallagher Decl., Ex. T, at 117; *see also* Def. 56.1 Stmt. ¶ 81; Pl. 56.1 Stmt. ¶ 50.)  The case involved an accident in which an individual, on exiting a taxi, had fallen into a hole in the concrete, and later died from his or her injuries.  (Gallagher Decl., Ex. T, at 116-18.)  On reviewing the file, Plaintiff came to believe that a tenant utilizing NYCTA's property was liable for the pedestrian's injuries and death.  (*Id.*, at 119-20.)  Although Redmond-Smith had told Plaintiff that she preferred to receive case updates from Plaintiff orally, scheduling conflicts[9] between Redmond-Smith and Plaintiff towards the end of Plaintiff's internship led Plaintiff to begin drafting a memorandum summarizing the case, and Plaintiff left the draft with Redmond-Smith at the conclusion of her internship.  (*Id.*, at 120-21; Def. 56.1 Stmt. ¶ 85; *see also* Vlad-Berindan Decl., Ex. 33 (copy of draft memorandum).)  Plaintiff testified that, during the majority of her internship, Redmond-Smith treated her with respect, and that the two had a productive working relationship.  (Gallagher Decl., Ex. T, at 123; *see also*

---

 [9] As discussed *infra*, Plaintiff contends that these scheduling conflicts were contrived, and that Redmond-Smith was, in fact, avoiding Plaintiff in retaliation for her filing of the Prior Action.  (*See* Background, *infra*, at Section A(7).)

Def. 56.1 Stmt. ¶ 123; Pl. 56.1 Stmt. ¶ 325 (stating that she "worked well" with Redmond-Smith).)

Plaintiff testified that, for the entirety of her internship, she did not discuss a paid paralegal consultant position "directly" with anyone at NYCTA.  (Gallagher Decl., Ex. T, at 132; *see also* Def. 56.1 Stmt. ¶ 87.)  Plaintiff further testified, however, that a secretary, Michelle Waterman, would often joke with Plaintiff, using the phrase "intern to perm," which, as Plaintiff described it, was "like making a joke that [Plaintiff] was an intern [but would become] a permanent employee."  (Gallagher Decl., Ex. T, at 132; *see also* Def. 56.1 Stmt. ¶ 88.)  Plaintiff also testified that circumstances during her internship "implied" that she would be hired for a permanent position.  (Gallagher Decl., Ex. T, at 132.)  In particular, Plaintiff pointed to "the work [she] received from attorneys," to the fact that NYCTA had placed a placard with her name on it on her workspace and assigned Plaintiff a work e-mail address, and to the fact that NYCTA granted her full access to NYCTA files, just like "for an employee."  (*Id.*)  Based on all of this, Plaintiff "assumed" that she would be hired permanently.  (*Id.*)

### 7. Conclusion of Plaintiff's Spring 2014 NYCTA Internship

When Plaintiff's internship ended, on April 29, 2014, she was not moved into a paid paralegal consultant position.  Plaintiff contends that NYCTA thus reneged on its promise to give her – or at least consider her for – that job, and she takes the position that NYCTA did so because it learned, shortly before her internship ended, that she had filed the Prior Action against it.  In fact, the record reflects that NYCTA was served with process in the Prior Action only one

week earlier, on April 22, 2014.  (Def. 56.1 Stmt. ¶ 119.)[10]  The question of when NYCTA first

learned of the existence of the Prior Action is, however, disputed by the parties.

First, Defendants contend that receipt of Plaintiff's 2013 EEOC charge was logged within

NYCTA's internal docketing system, known as the General Law Information System, or

"GLIS," on September 23, 2013, well before Plaintiff even started her 2014 internship.  (*See*

Gallagher Decl. ¶ 8 & Ex. F, at 8; Affidavit of Richard Harrington, sworn to Dec. 21, 2016

("Harrington Aff.") (Dkt. 109), ¶ 4; Def. 56.1 Stmt. ¶ 115.)  Second, Defendants assert that

Plaintiff's Complaint in the Prior Action (the "Prior Complaint") was itself entered into GLIS

before Plaintiff's internship began, although Defendants' submissions are somewhat inconsistent

as to whether the date of that entry was February 12 or February 20, 2014.  (*See* Def. 56.1 Stmt.

¶ 8 (indicating that the Prior Complaint was logged on February 12, 2014); *id.* ¶ 118 (indicating

February 20, 2014 as the date of entry).)  By affidavit, Richard Harrington ("Harrington"), the

Senior Administrative Assistant in the NYCTA Law Department, states that a GLIS "Matter

History Report" documenting filings and activities in the Prior Action was created (*see*

Harrington Aff. ¶¶ 1, 7), and the Matter History Report itself – a copy of which has been

submitted to the Court – reflects that it was created by Harrington on February 20, 2014

---

[10] Although this timing of service, coming shortly before the conclusion of Plaintiff's internship, might support the inference of a causal relationship between NYCTA's learning of the Prior Action and its determination not to convert Plaintiff's internship to a paid position, Plaintiff disputes that NYCTA was served on April 22, 2014, contending that service actually took place on August 22, 2014.  (Pl. 56.1 Opp. ¶ 118.)  It is apparent, though, that Plaintiff's contention in this regard reflects a misreading of the hand-stamped date of receipt affixed to the acknowledgment of service by mail (*see* Vlad-Berindan Decl., Ex. 36, at 2; *see also* Dkt. 7 in Case No. 14cv00675 (RJS)); indeed, the Summons could not have been served on August 22, as an acknowledgment of service by mail was executed by Robert K. Drinan, Esq. ("Drinan"), on May 19, 2014 and received by the Court on May 21, 2014 (*see* Dkt. 7 in Case No. 14cv00675 (RJS) (showing both Court's stamp and May 21, 2014 execution of the Return of Service by the U.S. Marshals Service)).

(Gallagher Decl., Ex. F, at 1; Vlad-Berindan Decl., Ex. 13, at 1).  As noted by Harrington,

though, the Matter History Report contains an entry stating "'2/12/2014 – Summons and

Complaint (Complaint Copied from Court Docket – MTA NYCT Not Yet Served),'" which,

according to Harrington, "reflects that, on February 12, 2014, the summons and complaint was

[sic] copied from the electronic docket on the United States District Court for the Southern

District of New York's ECF system."  (Harrington Aff. ¶¶ 9-10 (quoting Gallagher Decl., Ex. F,

at 7).)

   Plaintiff vigorously disputes not only the veracity of the statements contained within

Harrington's Affidavit, but also the authenticity of the Matter History Report.  (*See* Pl. 56.1 Opp.

¶¶ 8, 117.)  Plaintiff's points in this regard are difficult to follow, but, apparently, she contends

that Harrington could not have obtained the Prior Complaint prior to the service of any summons

without being "informed by a Court mole about Plaintiff's case number and filings."  (*Id.* ¶ 8; *see

also* Pl. 56.1 Stmt. ¶ 367.)  Plaintiff also argues that Harrington "did not and could not copy the

case summons" on February 12, 2014 (Pl. 56.1 Stmt. Opp. ¶ 8; *see also* Pl. 56.1 Stmt. ¶¶ 365-66,

368), as his affidavit states, because the presiding judge in the Prior Action did not issue an

Order of Service until March 17, 2014 (*see* Order of Service, dated Mar. 17, 2014 (Dkt. 6 in

Case No. 14cv00675 (RJS)), and summonses were not issued to the defendants in that action

until March 28, 2014 (*see* Docket in Case No. 14cv00675 (RJS)).  Plaintiff further argues that, as

the entry "2/12/2014 – Summons and Complaint (Complaint Copied from Court Docket – MTA

NYCT Not Yet Served)" appears on the final page of the Matter History Report related to the

Prior Action, while the final page of the Matter History Report related to *the instant action* only

contains information regarding the action's assigned attorneys, the entry in the earlier report

must have been fraudulently added.  (Pl. 56.1 Opp. ¶ 8; *see also* Pl. 56.1 Stmt. ¶ 369.)  For these

reasons, Plaintiff concludes that "Harrington's Affidavit is a perjury," and that the Matter

History Report is "a fabricated document."  (Pl. 56.1 Opp. ¶ 8.)

In an apparent response to Plaintiff's position regarding these documents, Defendants

submit, with their reply, a supplemental affidavit from Harrington.  (*See* Supplemental Affidavit

of Richard Harrington, sworn to Apr. 20, 2017 ("Harrington Supp. Aff.") (Dkt. 148).)  In his

supplemental affidavit, Harrington states that he "wish[es] to correct a statement" in his prior

affidavit – in particular, his statement that an entry on the Matter History Report "reflected that,

on February 12, 2014, the summons and complaint was [sic] copied from [the S.D.N.Y.] ECF

system."  (*Id.* ¶¶ 5, 8.)  Further, Harrington states that, "[t]o the extent the February 12, 2014

entry reflects that the 'Summons' . . . was copied from the docket, it is inaccurate," but that "the

entry is otherwise true and accurate to the extent it reflects that, on February 12, 2014, the [Prior

Complaint] was copied from the electronic docket on [the S.D.N.Y.'s] ECF system."  (*Id.*

¶¶ 9-10.)

In claiming that she was denied a paid position for retaliatory reasons, Plaintiff also

contends that, at the end of her internship, she was treated in a "cold" manner.  According to

Plaintiff, she "expected to be contacted before the end of her internship to hand [in] her

references and complete further formalities . . . needed for continuing to work" (Pl. 56.1 Stmt.

¶ 58), but, "not only" did no one contact her about additional paperwork "for further work for

[NYCTA] as she was promised, offered, and mutually accepted," "but[,] on or about April 22,

2014 (and after), seven days before her internship would end, Plaintiff felt that everybody

behaved different[ly] and cold toward her" (*Id.* ¶ 59; *see also* Vlad-Berindan Decl., Ex. 15

(Plaintiff's internship time log, indicating that her last day was April 29, 2014); Def. 56.1 Stmt.

¶ 89).  Plaintiff testified that, up until April 24, 2014, "everything" was "pretty good," but, after

that date, she "felt a difference at the end of the internship, like . . . [there was] a little bit colder [of a] relationship."  (Gallagher Decl., Ex. T, at 123-24; *see also id.*, at 135.)

Plaintiff's statements to the effect that NYCTA employees began behaving "coldly" toward her focus exclusively on:  (1) the manner in which Waters spoke to Plaintiff on April 29, 2014, at the conclusion of her internship; (2) Redmond-Smith's delay and alleged avoidance of Plaintiff in connection with completing Plaintiff's Employer Evaluation of Student form, and, in Plaintiff's view, the negative comments that Redmond-Smith included therein; and (3) Redmond-Smith's failure to complete, in a timely fashion, a law school recommendation form, which Plaintiff had requested that she complete.[11]

More specifically, Plaintiff first testified that, on the final day of her internship, she went to see Waters at her office to inform Waters that she had completed her internship.  (Gallagher Decl., Ex. T, at 126, 128; *see also* Def. 56.1 Stmt. ¶ 95; Pl. Stmt. 56.1 ¶ 349.)  Plaintiff testified that, in response, Waters stated "'okay'" and told Plaintiff to "'go and give [her] ID'" back to the appropriate person.  (Gallagher Decl., Ex. T, at 126, 128; *see also* Def. 56.1 Stmt. ¶¶ 21, 97.)  According to Plaintiff, she then asked Waters "'[T]hat's it[?]'" and Waters responded that "'yes, [this was] it and this was the end.'"  (Gallagher Decl., Ex. T, at 126; *see generally* Def. 56.1 Stmt. ¶¶ 22, 97; Pl. Stmt. 56.1 ¶ 349.)  Defendants, relying on the transcript of that testimony, include in their Rule 56.1 Statement the seemingly accurate account that, "[a]ccording to Plaintiff, she asked [Waters] 'That's it?' and Waters responded, 'Yes, that's it' and 'this was the end.'"  (Def. 56.1 Stmt. ¶ 97.)  Plaintiff, however, objects to this account of the event, stating that

---

[11] Plaintiff conceded at her deposition that, other than these negative interactions she experienced with Waters and Redmond-Smith, "[n]o" other event happened "that made [Plaintiff] feel that people were less friendly or treating [Plaintiff] in a cold manner towards the end of [the] internship."  (Gallagher Decl., Ex. T, at 129; *see also* Def. 56.1 Stmt. ¶ 98.)

she "did not testify that [Waters] responded 'Yes, that's it' and 'this was the end' because Plaintiff will not forget ever . . . how arrogant, sour, and bold [Waters] was when she said those strong words." (Pl. Opp. 56.1 Stmt. ¶ 97.) It appears, then, that Plaintiff's objection is that the deposition transcript does not capture the tone in which Waters spoke to Plaintiff, although Waters' words themselves are undisputed.

As noted, Plaintiff's second proffered evidence of "cold" conduct relates to Redmond-Smith's purported delay in completing Plaintiff's Employer Evaluation of Student form, which needed to be completed for Plaintiff's Internship II class. (*See* Vlad-Berindan Decl., Ex. 29.) As alluded to above, and by way of background, Plaintiff testified that she, Redmond-Smith, and Redmond-Smith's investigator, "Delgado," were to have a meeting to discuss a very difficult case that Plaintiff had been addressing. (Gallagher Decl., Ex. T, at 125; *see also* Pl. 56.1 Stmt. ¶ 70.) The planned conference never occurred, with Plaintiff believing that Redmond-Smith was "avoiding" her (*see supra*, at n.9), so Plaintiff voluntarily prepared a partially completed draft memorandum, summarizing her findings (Gallagher Decl., Ex. T, at 125 (Plaintiff: "[S]he knows that she never asked me to do a memorandum for her.")); Pl. 56.1 Stmt. ¶ 70 (stating that Plaintiff informed Redmond-Smith that she would "voluntarily put in writing her findings because they could not have that conference"); Def. 56.1 Stmt. ¶¶ 90-91). On April 28, 2016, the day prior to the end of Plaintiff's internship, Redmond-Smith had a conversation with Plaintiff, and stated that she would provide the evaluation the following day. (Gallagher Decl., Ex. T, at 127.)

On April 29, 2014, the last day of her internship, Plaintiff arrived at work around 9:00 a.m., but was unable to obtain the evaluation from Redmond-Smith, as Redmond-Smith stated that "she [had] to leave" and "would be in touch." (Gallagher Decl., Ex. T, at 126; *see*

24

*also* Pl. 56.1 Stmt. ¶¶ 70-71; Def. 56.1 Stmt. ¶ 93.)  Plaintiff concluded that Redmond-Smith was

once again "avoid[ing]" her.  (Gallagher Decl., Ex. T, at 125.)  Plaintiff agreed to wait, and, at

11:30 a.m., revisited Redmond-Smith's office, which was locked.  (Pl. 56.1 Stmt. ¶¶ 70-71.)

Plaintiff states that she then went "to Investigator Delgado's . . . office," and was told by

Investigator Delgado that Redmond-Smith had had "to leave work for an emergency."  (*Id.*

¶¶ 71, 329; *see also* Def. 56.1 Stmt. ¶ 94.)  Plaintiff contends that this "emergency" was a farce,

as Redmond-Smith's time records, produced by Defendants, indicate that she remained in the

office on April 29, 2014 from 8:43 a.m. to 5:28 p.m.  (Pl. 56.1 Stmt. ¶¶ 72, 330; Vlad-Berindan

Decl., Ex. 40 (time sheet for Redmond-Smith).)

  After April 29, 2014, Plaintiff repeatedly called Redmond-Smith and left messages, but

received no answer.  (Gallagher Decl., Ex. T, at 134, 146-47; Pl. 56.1 Stmt. ¶¶ 75, 332; Def. 56.1

Stmt. ¶ 101.))  Finally, on May 13, 2014, Plaintiff attempted to e-mail Redmond-Smith and

Alexis-Hayes, who forwarded Plaintiff's e-mail to Redmond-Smith, as Plaintiff had entered

Redmond-Smith's e-mail address incorrectly.  (*See* Gallagher Decl., Ex. T, at 146, 148-51;

Pl. 56.1 Stmt. ¶¶ 75, 332.)  In her e-mail, Plaintiff stated that she was inquiring regarding the

evaluation form "[b]ecause tomorrow I will have the last Internship Seminar class and I have to

submit the completed internship package."  (Vlad-Berindan Decl., Ex. 40.)  After being

forwarded Plaintiff's e-mail by Alexis-Hayes, Redmond-Smith replied to Plaintiff, stating that

she had "received [her] messages," but "couldn't call [Plaintiff] back because of court [and]

meetings."  (Vlad Berindan Decl., Ex. 41; *see also* Gallagher Decl., Ex. T, at 151; Def. 56.1

Stmt. ¶ 102.)  Redmond-Smith advised Plaintiff that she could pick up her evaluation from

Investigator Delgado on the following day, May 14, 2014.  (*See* Vlad Berindan Decl., Ex. 41; *see*

*also* Pl. 56.1 Stmt. ¶¶ 76, 334; Def. 56.1 Stmt. ¶ 102.)  On May 14, 2014, Redmond-Smith was

"not present," and Investigator Delgado provided the evaluation form to Plaintiff.  (*See* Gallagher Decl., Ex. T, at 135; *see also* Def. 56.1 Stmt. ¶¶ 102-03.)

On the form completed by Redmond-Smith, entitled "Employer Evaluation of Student," Redmond-Smith rated Plaintiff as "exceptional," the highest rating available, in all 16 evaluation areas.  (Vlad-Berindan Decl., Ex. 29, at 1; Gallagher Decl., Ex. L, at 1; *see also* Pl 56.1 Stmt. ¶ 54; Def. 56.1 Stmt. ¶ 104.)  In an area of the form reserved for commenting on "strengths," Redmond-Smith wrote, "Ms. Vlad-Berindan works well independently and trouble-shoots problems appropriately."  (Vlad-Berindan Decl., Ex. 29, at 1; Gallagher Decl., Ex. L, at 1.) Redmond-Smith added that Plaintiff was "good at spotting the correct issues to be addressed in her assignments."  (Vlad-Berindan Decl., Ex. 29, at 1; Gallagher Decl., Ex. L, at 1.)  In an area of the form reserved for "areas for improvement," Redmond-Smith commented that Plaintiff "should continue to work on making her reports more concise.  Her thoughts [and] ideas are good and I believe [with] practice she will be able to achieve this goal."  (Vlad-Berindan Decl., Ex. 29, at 1; Gallagher Decl., Ex. L, at 1; *see also* Def. 56.1 Stmt. ¶ 105.)  Redmond-Smith indicated that Plaintiff had "learned and demonstrated appropriate skills to be competitive" in the field, and that Redmond-Smith would recommend Plaintiff for employment at NYCTA or to other organizations.  (Vlad-Berindan Decl., Ex. 29, at 1; Gallagher Decl., Ex. L, at 1.)  In a section of the form reserved for further commentary, Redmond-Smith stated that it was a "pleasure to work" with Plaintiff, noting her "enthusiasm" and tenaciousness.  (Vlad-Berindan Decl., Ex. 29, at 2; Gallagher Decl., Ex. L, at 2.)  Redmond-Smith also stated that Plaintiff's "ideas for conducting additional research/investigation into a particularly troublesome case were very well thought out and assisted greatly with the direction of that investigation." (Vlad-Berindan Decl., Ex. 29, at 2; Gallagher Decl., Ex. L, at 2.)

On May 29, 2014, after reviewing Redmond-Smith's evaluation, Plaintiff sent an e-mail to her, complaining that her commentary regarding areas for improvement was unfair, as the memorandum at issue was voluntary work completed by Plaintiff, when she, Redmond-Smith, and Investigator Delgado were unable to meet for an in-person discussion.  (Vlad-Berindan Decl., Ex. 42, at 1; *see also* Gallagher Decl., Ex. L; Def 56.1 Stmt. ¶ 109.)  In the e-mail, Plaintiff noted that, "I told you that if I [could] not finish . . . my [voluntary] unrequested 'report,' I would leave you my draft."  (Vlad-Berindan Decl., Ex. 42, at 1; Gallagher Decl., Ex. L, at 1.)  In light of Redmond-Smith's evaluation, Plaintiff accused Redmond-Smith of "slapp[ing] [her in the] face," and "denigrating [her] before those who will read [the] evaluation."  (Vlad-Berindan Decl., Ex. 42, at 1; *see also* Gallagher Decl., Ex. L, at 1.)  On May 30, 2014, Redmond-Smith replied to Plaintiff's e-mail, stating that she felt "there [were] always areas for improvement," and describing her own "struggle" over the years to make her "written materials more concise."  (Vlad-Berindan Ex. 43, at 1; *see also* Gallagher Decl., Ex. M, at 1; Def 56.1 Stmt. ¶ 111.)  Redmond-Smith "maintain[ed] that [she] [had] given [Plaintiff] solid advice."  (Vlad-Berindan Ex. 43, at 1; *see also* Gallagher Decl., Ex. M, at 1.)

In testifying, Plaintiff reiterated that she was "very disappointed" with Redmond-Smith's comments on the evaluation form, particularly with regard to Redmond-Smith's advice that Plaintiff work to be more concise.  (Gallagher Decl., Ex. T, at 153, 156.)  Plaintiff felt that this commentary was unwarranted, as it related to a memorandum that Plaintiff had voluntarily created.  (*Id.*, at 156; *see also* Pl. 56.1 Stmt. ¶¶ 52-53.)  Plaintiff added that Redmond-Smith's comments were "unfair," as Plaintiff had explained "many times" that the document she provided Redmond-Smith was only a draft.  (Gallagher Decl., Ex. T, at 157 (Plaintiff: "How can a draft be . . . more concise if it's not finish[ed] work and especially when it's something you

27

[weren't] asked to [create]?").)  Plaintiff expressed her view that Redmond-Smith was "looking for something to criticize" and was "probably happy" to find the draft memorandum to critique. (*Id.*)

Finally, regarding the "coldness" Plaintiff felt during the final days of her internship (and thereafter), Plaintiff asserts that, although Redmond-Smith agreed to complete a law school recommendation for her, Redmond-Smith delayed in doing so, to the point that the recommendation became useless for entry into law school that school year.  Plaintiff states that, during her internship, "Plaintiff asked Redmond-Smith if she would write a Letter of Recommendation for her," and "e-mail it to the Law School Admission Council ("LSAC")," to which Redmond-Smith agreed.  (Pl. 56.1 Stmt. ¶ 81; *see also* Gallagher Decl., Ex. T, at 165.) According to Plaintiff, prior to the end of her internship, she reminded Redmond-Smith of the need to complete the recommendation, but Redmond-Smith did not write the letter, despite also receiving three reminder e-mails from LSAC itself.  (Pl. 56.1 Stmt. ¶ 81; *see also* Vlad-Berindan Decl., Ex. 44, at 1 (screenshot from LSAC webpage, indicating that, as of May 13, 2014, Redmond-Smith had not submitted a recommendation letter).)  Finally, on July 31, 2014, Redmond-Smith submitted the requested recommendation.  (*See* Pl. 56.1 Stmt. ¶ 81; *see also* Vlad-Berindan Decl., Ex. 44, at 2 (e-mail confirmation sent to Plaintiff, confirming that Redmond-Smith had submitted a recommendation letter on July 31, 2014).)  Plaintiff states, however, that this "was too late because [law] classes would start the next day," and that she had not been admitted to law school because LSAC would not submit incomplete application packages to law schools.  (Pl. 56.1 Stmt. ¶ 81; *see also* Gallagher Decl., Ex. T, at 166 (Plaintiff testifying that, due to the absence of Redmond-Smith's recommendation letter, her applications could not be timely submitted).)

Plaintiff testified that, from the time of her telephone call with Waters on February 13, 2014, through the conclusion of her internship, she never told any fellow employees about the Prior Action.  (*See* Gallagher Decl., Ex. T, at 109.)  Plaintiff also testified that, from the time she accepted the spring 2014 internship, on March 10, 2014, through the end of her internship, she never heard "any discussions about the fact that [she] had filed an EEOC charge [and] a federal complaint against [NYCTA]."  (*Id.*, at 130.)  Plaintiff further testified that no one had ever told her, and she had never heard, that any employees had ever discussed her prior EEOC charge or the Prior Action.  (*Id.*, at 131; Def. 56.1 Stmt. ¶ 100.)

With respect to any continued inquiries regarding the possibility of serving as a paid paralegal consultant, Plaintiff testified that, after her phone call with Waters on February 13, 2014, she never discussed such a position with Waters.  (Gallagher Decl., Ex. T, at 130.)  When asked if, following the conclusion of her spring 2014 internship, she had subsequently contacted Waters or Redmond-Smith regarding a paralegal consultant position, Plaintiff answered in the negative.  (*Id.*, at 191 ("After they were so nasty at the end of my internship?").)  Plaintiff stated that she "was hurt enough."  (*Id.*; *see also* Def. 56.1 Stmt. ¶ 99 ("Plaintiff testified that she never contacted [Waters], Redmond-Smith or anyone else about the contract paralegal position after her internship concluded.").)

### 8.   NYCTA Hiring of Other Interns as Paid Paralegal Consultants

Plaintiff has submitted evidence regarding the intern and paralegal consultant hiring process with respect to two other individuals, Adriana Tobar ("Tobar") and Manasseh Simmons ("Simmons"), each of whom served as a paralegal intern before, or in conjunction with, service as a paid paralegal consultant.

On February 10, 2011, Tobar was interviewed by a number of NYCTA staff, who provided positive commentary on an interview review form.  (*See* Vlad-Berindan Decl., Ex. 24, at 2; Ex. 22, at 1; *see also* Pl. 56.1 Stmt. ¶ 351).)  At the time of her application, Tobar, according to her resume, was a student in the Legal Assistant Studies program at City Tech; had worked in a variety of Spanish interpretor, office assistant, and retail positions; and had also served as a paralegal intern from August to December 2008.  (*See* Vlad-Berindan Decl., Ex. 22, at 2.)  Tobar was accepted for an NYCTA internship, and, on April 12, 2011, Waters completed a student employer evaluation regarding her performance.  (*See id.*, at 2,  10.)  Waters rated Tobar's skills as "exceptional" in all areas, except for "us[ing] creativity in task management," which she rated as "above average."  (*Id.*, at 10.)  Waters indicated that Tobar's strengths included understanding tasks and performing them "in a meticulous manner," and being "highly motivated."  (*Id.*)  On the portion of the form for "Areas for Improvement," Waters wrote:  "very little," adding only that "[p]roficiency in this field will come with time and maturity[,] and [Tobar] is well on her way to accomplishing this."  (*Id.*)  Finally, Waters noted that Tobar had "been an absolute pleasure to have in [her] unit," that Tobar had "a good grasp of legal issues and always [strove] to complete her assignments in a timely and professional manner," that she "show[ed] initiative and work[ed] well independently," that she had "an excellent work ethic," and that she would be "a tremendous asset to any organization she is involved with on a professional level."  (*Id.*, at 11.)  Tobar completed the internship in May of 2011, and graduated from college in June of that same year.  (*Id.*, at 2.)  Tobar subsequently served as a Walgreens Pharmacy Sales Clerk, beginning in October of 2011.  (*Id.*)

An undated AFDR indicates, however, that, at some point, Tobar was chosen as a "selected candidate" for a paralegal consultant position at NYCTA, after being re-interviewed by

two NYCTA team members.  (*Id.*, Ex. 23, at 6.)  In addition, a Procurement Justification Form

for the filling of that position was completed, being first signed by Law Department members on

January 9, 2012, and finally executed by Procurement staff on January 17, 2012.  (*Id.*, at 7.)

Tobar and NYCTA staff also executed a Paralegal Retainer Agreement.  (*See id.*, at 8-10.)  The

initial term of Tobar's paralegal consultant position was from January 2 through December 31,

2012 (*see id.*, at 7-8), and that term was ultimately renewed, via additional Procurement

Justification Forms and Retainer Agreements, first to run from January 1 through December 31,

2013, and then, by revision, to run from April 1, 2013 to an indefinite date (*see id.*, at 11-17; *see

generally* Pl. 56.1 Stmt. ¶ 352).

        During the spring of 2011, NYCTA also interviewed and retained Simmons for a

paralegal consultant position, as well as an internship.  (*See* Vlad-Berindan Decl., Ex. 24, at 4, 6;

*see also* Pl. 56.1 Stmt. ¶ 353.)  Simmons was interviewed on the same date as Tobar,

February 10, 2011, according to an interview appointment form.  (*See* Vlad-Berindan Decl.,

Ex. 24, at 3.)  At the time of her application (or, rather, applications), Simmons was an enrolled

student in the Legal Assistant Studies baccalaureate program at City Tech, with an expected

graduation date of June 2011.  (*Id.*, at 1 (Simmons's resume).)[12]  As reflected in an undated letter

from Professor Williams, Simmons was granted special permission to complete an internship in

conjunction with a paid paralegal consultant position.  (*See id.*, at 4 (noting Professor Williams's

"understand[ing] [that Simmons would] be starting in April as an unpaid intern," and that

Simmons "[might] soon be working with [NYCTA] pursuant to a paid position").)

---

        [12] According to the same document, Simmons reportedly had worked as a paralegal for
the Law Office of Scott Gross, from May 2009 to 2010, and had also completed a paralegal
internship with Joy Alessi, Esq., from February to May of 2009.  (Vlad-Berindan Decl., Ex. 25,
at 1.)

A Procurement Justification Form was executed by members of the Law Department in early March of 2011, and finally executed by Procurement staff on April 4, 2011, pursuant to which Simmons was retained as a paralegal consultant from March 3 through December 31, 2011.  (*Id.*, Ex. 25, at 5; *see also id.*, at 6-8 (related Paralegal Retainer Agreement).)[13]  At some point, Simmons was apparently also accepted for an overlapping internship position, as Waters completed a student evaluation form, dated May 17, 2011.  (*See id.*, Ex. 24, at 11-12.)  Waters rated Simmons as "exceptional" or "above average" in all areas, noting that Simmons was "efficient, competent, thorough, and pleasant."  (*Id.*, at 11.)  In the section of the form dedicated to "Areas for Improvement," Waters indicated that Simmons was "a perfectionist," and that, "as she matures," she would come to understand that she "cannot please everyone all the time."  (*Id.*)  Waters also commented that Simmons was "a delight to have in [her] unit," that she was "responsible, professional, and structured," that she "work[ed] well with the attorneys in the unit," that she "always [sought] to know the details and reasons behind tasks she [was] given," and that she had "great potential and perform[ed] well."  (*Id.*, at 12.)

After completion of the internship, Simmons apparently stayed on at NYCTA in her role as a paid paralegal consultant.  Via a newly completed Procurement Justification Form and Paralegal Retainer Agreement, NYCTA extended Simmons's consultancy from January 1, 2012 to an indefinite date.  (*See id.*, at 9-12.)  On May 3, 2013, Simmons submitted a letter of resignation to Waters, indicating that her last day would be May 10, 2013.  (*Id.*)

Although Plaintiff's statements in her Declaration regarding Exhibits 23-25, which contain the materials discussed above in relation to Tobar and Simmons, are somewhat difficult

---

[13] Plaintiff notes that no AFDR form was produced by Defendants related to Simmons's hiring.  (Pl. 56.1 Stmt. ¶ 354.)

to parse, it at least appears undisputed that, on these two occasions, NYCTA hosted individuals as interns and also hired them as paralegal consultants.  (*See* Vlad-Berindan Decl. ¶¶ 23-25.) Further, Plaintiff appears to be offering these documents in an attempt to show that certain paperwork for paralegal consultant work was only completed after, or during, Tobar's and Simmons's internships, such that the the lack of such documentation in Plaintiff's case does not mean that Plaintiff was never offered a paralegal consulting position.  (*See id.*)  In that vein, Plaintiff asserts that it was only upon learning of the Prior Action that NYCTA's "paralegals hirer did not pursue the next steps for hiring Plaintiff as a paralegal-contractor after the internship," "as Defendant NYCTA did with other interns before."  (Pl. 56.1 Stmt. ¶ 6; *see also id.* ¶ 88.)

### 9.     NYCTA Employment of Barbara Wheatle and Toshario Martinez Prior to, and After, Plaintiff's Internship

On Thursday, August 16, 2012, Barbara Wheatle ("Wheatle") was interviewed by Torts Division staff for a paralegal consultant position.  (*See* Vlad-Berindan Decl., Ex. 48, at 2.)[14] According to her resume, Wheatle graduated *cum laude* with a B.A. in Justice Studies from John Jay College ("John Jay") in 2011, and, at the time of her application, she was enrolled in New York Law School.  (*See* Vlad-Berindan Decl., Ex. 48, at 1.)  Wheatle had previous work experience as a college tutor while at John Jay.  (*See id.*)  Additionally, Wheatle had reportedly worked as a receptionist from January 2010 to October 2011, and as an administrative assistant from January 2011 to June 2013.  (*Id.*)  Prior to that time, from September 2008 to February 2010, Wheatle had served as a tutor at "CAMBA YABC," supervising assignments "for students who [had] failed the [R]egents [Exam] in prior sittings."  (*Id.*)  Wheatle claimed to be

---

[14] Other than a few brief questions regarding Wheatle during Plaintiff's depositions, Defendants' submissions contain no references to Wheatle or to Toshario Martinez ("Martinez").

"proficient" in the use of Microsoft Word, Excel, and Powerpoint, as well as "proficient in both Spanish and French." (*Id.*)

Wheatle's interviewers were evidently impressed; a document entitled "Position: Paralegal Consultant," which appears to be an interview note-taking document, contains favorable notes from multiple individuals, along the lines of: "would appear to work well w/ attny staff and support staff," "She's now my #1 choice," and "I agree." (*Id.*, at 2.) On August 27, 2012, Waters provided a short memorandum to Danielle Ruttman ("Ruttman"), Deputy Executive Assistant Agency counsel, regarding "references for Barbara Wheatle," documenting positive conversations that Waters held with two of Wheatle's references. (*Id.*, at 5.) Plaintiff has also proffered an undated AFDR for Wheatle; this form was apparently completed following a reference check on Wheatle, as it indicates that Waters performed that reference check. (*Id.*, at 8.) The document indicates that Wheatle's interviewers, Waters, Redmond-Smith, and Maria Fisch, had chosen Wheatle as their "selected candidate" from a pool of five applicants. (*Id.*) Between August 29 and 31, 2012, Law Department members executed a Procurement Justification Form for Wheatle, indicating that "Ms. Wheatle was selected based on her education and experience." (*Id.*, at 9.) On September 4, 2012, the Procurement Justification Form became fully executed, upon the sign-off of a member of the Procurement team. (*See id.*, at 9.) The form indicates that Wheatle had been approved as a paralegal consultant for a term from August 29 through December 31, 2012. (*Id.*; *see also id.*, at 10-12 ("Temporary Professional Services Retainer Agreement," fully executed on August 30, 2012, indicating that Wheatle would be paid at the rate of $14.50 per hour"[15]).) Wheatle's term as a Paralegal

---

[15] Plaintiff was very consistent in her deposition testimony in stating that she had been told, during both her initial telephone call with Waters on February 13, 2014 and during her March 7, 2014 interview, that paralegal consultants were paid $10 per hour. (*See, e.g.*, Gallagher

Consultant was extended two additional times, to run from January 1, 2013 through December 31, 2014, and then to run from January 1, 2014 through December 31, 2014.  (*See generally id.*, at 13-20.)  A brief document listing Wheatle's name and the names of her references indicates, however, that her "start date" was September 17, 2012, and that her end date was ultimately April 24, 2014, not December 31, 2014.  (Vlad-Berindan Decl., Ex. 8.)

On April 23, 2014, Waters wrote a memo to Ruttman, stating that, "[d]uring the week of March 3, 2014," Wheatle had advised Waters that "she would be resigning at the end of April, 2014 or the beginning of May, 2014."  (*Id.*, at 25.)[16]  Rather than continuing to work through this period, however, it appears that, on March 7, 2014, Wheatle e-mailed Waters, Redmond-Smith, and others, indicating that she would be out of the office during the following week.  (*Id.*, at 24.)  Further, Wheatle evidently did not return the week thereafter, and Waters sent Wheatle numerous e-mails regarding her absence.  (*See id.*, at 22-24 (e-mails from Wheatle to Waters, dated Mar. 19 to Apr. 3, 2014).)  Wheatle sent only one message in the interim, stating that she "[was] completely burned out."  (*See id.*, at 21-23.)  Wheatle's e-mail did not reiterate that she wished to resign her position, much less provide further specificity as to the date she intended to resign.  (*See id.*)  Accordingly, in the memo that Waters wrote to Ruttman on April 23, 2014, Waters sought "approval to terminate [Wheatle's] services" due to her absence "over a period of five weeks without proper communication or explanation from [Wheatle]."  (*Id.*, at 25.)  On

---

Decl., Ex. T, at 46:21-25; 81:15-17; 87:9-21; 138:12-17.)  Now, Plaintiff states (apparently for the first time) that this number reflects the $14.50 rate of pay per hour offered to other paralegal consultants, less taxes.  (*See, e.g.*, Pl. 56.1 Stmt. ¶¶ 57 n.2 & 315.)

[16] Waters' memo of April 23, 2014 is the only evidence offered regarding Wheatle's expressed intention, as of March 3, 2014, to leave within the time-frame specified.

April 24, 2014, Ruttman addressed a letter to Wheatle, terminating her employment with NYCTA.  (*See id.*, at 26.)

In response to questioning regarding whether Wheatle's position was "the position that [she had] expected to get," Plaintiff replied that she had been "told that that was the position, yes," although she could not recall when or by whom.  (Gallagher Decl., Ex. T, at 193; *see also id.*, at 162 (Plaintiff's stating that Wheatle was "the person who worked in the same [paralegal consultant] position that [Waters] had opened"); Pl. 56.1 Stmt. ¶ 318 (asserting that Plaintiff was accepted as an intern to replace Wheatle, ultimately permanently); Vlad-Berindan Decl. ¶ 340.)

In her summary judgment submissions, Plaintiff also states that she worked three full days a week as a paralegal to replace an individual "missing from work [five] weeks prior [to when] her contract would expire," presumably Wheatle.  (Pl. 56.1 Stmt. ¶ 6.)  According to Plaintiff, Wheatle "quit her job on March 10, 2014," shortly after Plaintiff was interviewed on March 7, 2014.  (*Id.* ¶ 23.)  Plaintiff suggests that, as Wheatle's "retainer termination date" was April 24, 2014, Waters could not fill Wheatle's position right away.  (*See id.*)[17]  Plaintiff contends that, instead, Waters "created the paralegal-intern position for Plaintiff after her March 7, 2014 interview," not due to the need for an intern, but due both to Plaintiff's request for a City-Tech-compliant internship, and "because by chance" Wheatle quit performing her job on March 10, 2014.  (Pl. 56.1 Stmt. ¶¶ 23, 342.)[18]  Citing various e-mails and documents that

---

[17] Plaintiff's suggestion is at odds with the actual terms of Wheatle's final retainer agreement with NYCTA, which, as noted, specified that Wheatle's final contract term would run from January 1, 2014 through December 31, 2014, although Wheatle ultimately was terminated via letter on April 24, 2014.

[18] Plaintiff's contention that Waters created a special internship position for Plaintiff due to Wheatle's absence appears inconsistent with Plaintiff's statements elsewhere, to the effect that Waters contemplated creating such an internship position as early as receipt of Plaintiff's resume on February 13, 2014.  (*See* Background *supra*, at Section A(5).)

reference Plaintiff's "work," or "working," Plaintiff states that NYCTA had "the expectation that qualified paralegal Plaintiff would literally **work** for them" as a paralegal consultant replacement "for their close to end contract/April 24, 2014 with [Wheatle] [sic]."  (Pl. 56.1 Stmt. ¶ 42 (citing Vlad-Berindan Decl., Exs. 4-7, 10-12, 26, 28), *see also id.* ¶¶ 43-45, 54.)  In other words, "only the word work [sic] was used by Defendants because they knew that Plaintiff was already a qualified paralegal and [that she had] accepted work as a paralegal."  (*Id.*)

As noted above, Plaintiff asserts that Defendants became aware of the Prior Action on April 22, 2014, the date the Summonses and Complaint in the Prior Action were stamped as received, and further states that, in retaliation for her commencement of that action, NYCTA chose to hire Martinez, rather than her, for the paralegal consultant position that became open upon Wheatle's termination.  (Pl. 56.1 Stmt. ¶¶ 93-94.)  Plaintiff states that NYCTA did this even though, to her understanding, Wheatle's paralegal consultant position fortuitously became open very close in time to the conclusion of Plaintiff's internship.  (*See* Vlad-Berindan Decl., Exs. 8, 12.)

It is apparently undisputed that Martinez was hired as a replacement for Wheatle. (Vlad-Berindan Decl., Ex. 42, at 89 (Checklist for Paralegal Consultant, from Waters to Ruttman, dated June 6, 2014, stating "Toshario Martinez will be replacing:  Barbara Wheatle").[19] According to a copy of her resume, Martinez obtained a B.A. in Criminal Justice from John Jay in 2011, and a Paralegal Certification from Hunter College of Continuing Education in 2013. (*See id.*, at 1.)  At the time of her application, Martinez had been working for several months as a paralegal intern, and had served as a spa attendant/coordinator from July 2009 to November

---

[19] Plaintiff asserts that this statement indicates that Waters was, in fact, "in charge with hiring and/or firing paralegal [consultants]." (Vlad-Berindan Decl. ¶ 54.)

2013.  (*Id.*)  Martinez claimed to have "skills" in Lexis Nexis and Microsoft Office applications.
(*Id.*)  An undated AFDR indicates that Martinez was ultimately the selected candidate from
among six other candidates for the paralegal consultant position, and that she had been
interviewed by Waters, Redmond-Smith, and Alexis-Hayes.  (*Id.*, at 4.)  On June 6, 2014, Waters
wrote a memorandum to Ruttman, summarizing the reference checks conducted on Martinez and
concluding that she "would be an asset to [the] office."  (*Id.*, Ex. 24, at 5.)  Martinez was hired,
using the standard paperwork (including a Procurement Justification Form), on June 6, 2014, and
her contract was renewed several times, at least through December 31, 2015.  (*See id.*, Ex. 49,
at 6-12; *id.*, Ex. 53.)

## B.   Relevant Procedural History

### 1.   Plaintiff's 2014 EEOC Charge and the Filing of This Action

On July 28, 2014, Plaintiff filed an EEOC charge, related to her second internship,
alleging that NYCTA had discriminated against her on the basis of her race, gender, and
disability, and had taken retaliatory actions against her based on her filing of the Prior
Complaint, in violation of Title VII, the ADA, and the ADEA.  (*See* Gallagher Decl., Ex. B, at 1,
4-5, 7; Pl. 56.1 Stmt. ¶¶ 96-97;  Def. 56.1 Stmt. ¶¶ 23-26.)  On September 17, 2014, the EEOC
issued a "Dismissal and Notice of Rights" form to Plaintiff, informing her that "the EEOC [was]
unable to conclude that the information obtained establishe[d] violations of the [relevant]
statutes."  (Gallagher Decl., Ex. B, at 10; *see also* Pl. 56.1 Stmt. ¶ 99.)  The EEOC stated that its
decision "did not certify that [NYCTA was] in compliance with the [relevant] statutes," and
informed Plaintiff of her right to sue within 90 days of receipt of the notice.  (Gallagher Decl.,
Ex. B, at 10.)

Plaintiff initiated the instant lawsuit by filing a Complaint on December 15, 2014.  (*See* Complaint, dated Dec. 15, 2014 ("Compl.") (Dkt. 2).)  In her Complaint, Plaintiff alleged that, "[d]uring the . . . [second] internship or before, the Defendants were informed about Plaintiff's [earlier EEOC charge and the Prior Action,]" and that, "in retaliation," Defendants refused to hire her for the promised paralegal consultant position that was to follow her internship.  (*Id.* ¶ 52.)  As in the Prior Action, Plaintiff brought a number of discrimination and wage-and-hour claims against Defendants.  (*See generally id.*)  On April 1, 2016, Judge Caproni issued an Amended Opinion and Order, adopting in part the Report and Recommendation of Magistrate Judge Frank Maas, and dismissing all but those retaliation claims that are the subject of the present motions.  (*See generally* Dkt. 46.)

### 2.   Service of the Summonses and Complaint in the Instant Action, and Timing of Defendants' Response

Plaintiff asserts that all Defendants listed in the case caption were served properly by the U.S. Marshals Service ("USMS"), in that the USMS mailed to each defendant on April 14, 2015 a Summons, Complaint, and other necessary materials.  (Pl. 56.1 Stmt. ¶¶ 3, 104, 260; *see also* Dkts. 9-12.)  Plaintiff states, however, that Drinan committed perjury when he executed acknowledgments of receipt of service for each defendant and dated those acknowledgments May 19, 2015, as each of the Defendants had hand-stamped the Summons and Complaint as having been received on April 21, 2015.  (*See* Pl. 56.1 Stmt. ¶ 3 (Drinan . . . signed under the penalty of perjury . . . stating that he received the summons and complaint(s) from [the] Marshals on May 19, 2015[;] that is a false statement."); *see also id.* ¶¶ 105-10, 112-13, 116; 265.) Plaintiff further asserts that the Matter History Report maintained by NYCTA for this action also indicates that Drinan committed perjury, as it states that Harrington made an entry, dated April 29, 2015, stating "'Statement of Service by Mail and Acknowledgement of Receipt by

Mail of Summons and Complaint.'" (*Id.* ¶ 111 (quoting Vlad-Berindan Decl., Ex. 70); *see also id.* ¶ 263.)  According to Plaintiff, April 21, 2015 "is the real date of service on Defendants," as that is when "they stamped the Marshals [sic] Statements."  (*Id.* ¶ 262.)

Plaintiff additionally contends that Defendants did not timely respond to the Complaint, as they did not answer or move against the Complaint within 21 days of service.  (*See* Pl. 56.1 Stmt. ¶ 3.)  Although Plaintiff cites and attaches a copy of the Court's Standing Order regarding the amount of time for response granted to a defendant who signs an acknowledgment of receipt of service by mail (*see id.*; *see also* Vlad-Berindan Decl., Ex. 59 (Standing Order, In re Extending Time to Answer After United States Marshals Service Effects Service On a Defendant by Mail Under N.Y. C.P.L.R. § 312-a, dated Dec. 30, 2013 ("Standing Order") (Dkt. 1, in Case No. 13mc0438)), and although that Standing Order would have permitted Defendants (a) 30 days from receipt of service to return a signed acknowledgment of receipt, and then (b) an additional 60 days from the return of the form to respond to the Complaint (*see* Standing Order), Plaintiff appears to contend that Defendants should not have been permitted to take advantage of the time frames set out in the Standing Order, given Drinan's purportedly false statement regarding the date of service (*see* Pl. 56.1 Stmt. ¶ 3 ("the Order does not state Defendants to declare false date of service").

### 3. <u>Plaintiff's Motion To Strike Her Deposition Testimony</u>

On August 25, 2016, Plaintiff filed a motion seeking, on a number of grounds, to "suppress" testimony given by her at her deposition, conducted on June 22 and July 1, 2016.  (*See* Dkt. 70.)  One of the stated grounds for that motion was that each deposition's cover sheet indicated, inaccurately, that the deposition had been taken "pursuant to a Court Order."  (*See id.*)  On September 2, 2016, Judge Maas denied Plaintiff's motion for failure to seek a pre-motion

conference, except he ruled "that the reference to Ms. Vlad-Berindan's deposition having been taken pursuant to Court Orders shall be deemed stricken from the transcript."  (Dkt. 72; *see also* Pl. 56.1 Stmt. ¶ 446.)  Plaintiff now states that the transcripts submitted by Defendants in connection with the summary judgment motions still contain the same language, and are therefore inadmissible.  (*See* Pl. 56.1 Stmt. ¶¶ 445-49; *see also* Vlad-Berindan Decl. ¶¶ 108, 110 & Exs. 108 & 110 (attaching transcripts with pages condensed to quarter-page size, and stating that "Defendants' Attorneys obvious intention" was to obscure that this language had not been removed).)

Plaintiff also notes that she refused to sign the deposition transcripts, and states that they are "inadmissible evidence" for this reason, as well.  (Pl. 56.1 Stmt. ¶ 444.)  In this regard, although each transcript states that Plaintiff and Defendants stipulated "that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness," Plaintiff contends that she never agreed to such a stipulation.  (*Id.* ¶¶ 214, 445.)

Finally, Plaintiff states that she felt extreme stress and had to take an overdose of pain medication during her depositions.  (*Id.* ¶ 452.)  She argues that, because "her state of mind [was] under the influence of strong medicine and pain," her deposition testimony should now "be suppressed."  (*Id.* ¶ 455.)[20]

---

[20] At Plaintiff's first deposition, on June 22, 2016, when asked if she was "taking any medications . . . that would interfere with [her] ability to either understand the questions or respond to the questions," Plaintiff answered in the affirmative, indicating that she was prescribed Empagliflozin, Propanolol, Amlodipine, Aspirin, Losartan, Metformin, Simvastatin, Percocet, Ibuprofen and Vitamin D2.  (Gallagher Decl., Ex. T, at 6.)

### 4. The Parties' Cross-Motions for Summary Judgment

On December 21, 2016, NYCTA filed a motion for summary judgment, seeking

dismissal of all of Plaintiff's remaining claims against them.[21]  On March 10, 2017, Plaintiff

filed papers in opposition to NYCTA's motion, and in support of a cross-motion for summary

judgment or a default judgment in her favor.[22]  On April 21, 2017, Defendants filed a reply,

along with an affidavit from Richard Harrington addressing (as noted above) an alleged error in

his original affidavit.[23]  Plaintiff did not file a reply on her cross-motion.

### DISCUSSION

## I. SUMMARY JUDGMENT STANDARDS

### A. Rule 56 Standards

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary

judgment should be granted "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

*see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Continental, Inc.*,

95 F.3d 123, 128 (2d Cir. 1996).  The moving party bears the burden of showing that no genuine

---

[21] *See* Notice of Motion, dated Dec. 21, 2016 (Dkt. 105), Memorandum of Law in Support of Defendants' Motion for Summary Judgment, dated Dec. 21, 2016 ("Def. Mem.") (Dkt. 105); Def. 56.1 Stmt. (Dkt. 106); Waters Aff. (Dkt. 107); Schaffner Aff. (Dkt. 108); Harrington Aff. (Dkt. 109); Gallagher Decl. (Dkt. 110).

[22] *See* Plaintiff's Cross-Motion for Summary Judgment and Default Judgment and Plaintiff's Opposition to Defendants' Motion for Summary Judgment, dated Mar. 10, 2017 (Dkt. 118); Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment and Default Judgment and Opposition to Defendants' Motion for Summary Judgment, dated Mar. 10, 2017 ("Pl. Mem.") (Dkt. 119); Plaintiff's Opposition to Defendants' Statement of Material Facts Pursuant to Rule 56.1, dated Mar. 10, 2017 ("Pl. 56.1 Stmt. Opp.") (Dkt. 120); Pl. 56.1 Stmt. (Dkt. 121); Vlad-Berindan Decl. (Dkt. 122).

[23] *See* Reply Memorandum in Support of Defendants' Motion for Summary Judgment, dated Apr. 21, 2017 ("Def. Reply") (Dkt. 147); Harrington Supp. Aff. (Dkt. 148).

issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). This

burden may be satisfied "by pointing out the absence of evidence to support the non-movant's

claims." *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 710 (2d Cir. 1991) (citing *Celotex*,

477 U.S. at 325).

Once the movant meets this burden, the non-moving party "must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex*,

477 U.S. at 322-23). Specifically, the non-moving party must cite to "particular parts of

materials in the record" or show "that the materials cited [by the movant] do not establish the

absence . . . of a genuine dispute" as to any material fact. Fed. R. Civ. P. 56(c)(1). "The

substantive law governing the case will identify those facts that are material and 'only disputes

over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment.'" *Gannon v. AETNA Life Ins. Co.*, No. 05cv2160

(JGK), 2007 WL 2844869, at *9 (S.D.N.Y. Sept. 28, 2007) (quoting *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248 (1986)). Further, the party opposing summary judgment "may not rely

on conclusory allegations or unsubstantiated speculation," *Scott v. Almenas*, 143 F.3d 105, 114

(2d Cir. 1998) (citing *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)), as

"unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.,*

224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Rather, a plaintiff opposing summary

judgment "must lay bare his proof in evidentiary form and raise an issue of fact sufficient to send

to the jury." *Weiss v. La Suisse, Societe D'Assurances Sur La Vie,* 293 F. Supp. 2d 397, 408

(S.D.N.Y. 2003) (internal quotation marks and citations omitted); *see Smith v. Menifee*,

No. 00cv2521 (DC), 2002 WL 461514, at *3 (S.D.N.Y. Mar. 25, 2002) (holding that the non-

moving party must present "significant probative evidence tending to support the complaint" (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

In reviewing the evidentiary record, the court "must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his [or her] favor." *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001). If, even viewed in this light, there is not "sufficient evidence favoring the non[-]moving party for a jury to return a verdict for that party," or if the "evidence is not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50 (citations omitted). It is well-settled, however, that "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) (citations omitted). The issue for summary judgment is "not whether [the court] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-movant] on the evidence presented." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 788 (2d Cir. 2007) (internal quotation marks and citation omitted).

## B.     Local Civil Rule 56.1

Under this Court's local rules, a party moving for summary judgment under Rule 56 must submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing the district courts from the need to hunt through voluminous records without

44

guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). Local

Rule 56.1, however, does not relieve the party seeking summary judgment of the burden of

establishing that it is entitled to judgment as a matter of law. *Id.* Thus, the Court may not rely

solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement;

it also must be satisfied that the moving party's assertions are supported by the record. *See*

*Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Zerafa v.*

*Montefiore Hosp. Hous. Co.*, 403 F. Supp. 2d 320, 329 n.12 (S.D.N.Y. 2005).

### C.   General Standards of Review for Retaliation Claims Under Title VII, the ADA, and the ADEA

Title VII, the ADA, and the ADEA each make it unlawful to retaliate against an

employee who has exercised his or her right to complain about an employment practice that the

employee believes to be discriminatory and unlawful under the relevant statute. *See*

42 § 2000e-3 (Title VII forbids retaliation against an individual "because he has opposed any

practice made an unlawful employment practice by [Title VII], or because he has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under

[Title VII]"); *Woods v. Start Treatment & Recovery Ctrs., Inc.*, No. 16-1318-cv, 2017 WL

3044628, at *5 (2d. Cir. July 19, 2017) (noting that 42 § 2000e-3(a) of Title VII forbids

retaliation); 42 U.S.C. § 12203(a) (ADA retaliation bar); *Sarno v. Douglas Elliman-Gibbons &*

*Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) (noting that 42 U.S.C. § 12203(a) of the ADA

prohibits retaliation, and stating "that it is appropriate to apply the framework used in analyzing

retaliation claims under Title VII in analyzing a claim of retaliation under the ADA" (citations

omitted)); 29 U.S.C. § 623(d) (ADEA retaliation bar); *Wanamaker v. Columbian Rope Co.*, 108

F.3d 462, 465 (2d Cir. 1997) (recognizing that 29 U.S.C. § 623(d) of the ADEA prohibits

retaliation, and stating that "retaliation claims brought under [the] ADEA [are] treated similarly to those brought under Title VII" (citation omitted)).

Although claims brought under these three statutes are analyzed similarly, recovery for retaliation under each statute is limited to individuals who have complained about activity protected by each particular statute.  Unlawful employment practices prohibited by Title VII include retaliation for complaints of discrimination based on an individual's "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2; *see also Cooper v. N.Y.S. Dep't of Labor*, 819 F.3d 678, 681 (2d Cir. 2016) (affirming dismissal of retaliation claim where the "conduct [plaintiff] opposed" was "not a 'practice made an unlawful employment practice' by Title VII" (quoting 42 U.S.C.§ 2000e-3a)); *Gaines v. NYCTA*, 528 F. Supp. 2d 135, 149 (E.D.N.Y. 2007) ("[p]laintiff engaged in protected activity [under the ADA] when he filed an EEOC charge and lawsuit against the TA" regarding disability discrimination); *Staten v. City of N.Y.*, No. 14cv4307 (ER), 2015 WL 4461688, at *12 (S.D.N.Y. July 20, 2015) (noting that "the ADEA applies only to individuals who are over forty years of age" (citing 29 U.S.C. § 631)); 29 U.S.C. § 631 (ADEA provision rendering it unlawful to discriminate against an individual "because such individual . . . has opposed any practice *made unlawful by this section*" (emphasis added)).

As set forth in the Court's Amended Order and Opinion on Plaintiff's motion to dismiss, the elements required for a plaintiff to establish a *prima facie* claim of retaliation are substantially identical under all three statutes.  *Vlad-Berindan*, 2016 WL 1317700, at *2 (citing *Littlejohn v. City of N.Y.*, 795 F.3d 297, 315-16 (2d Cir. 2015) (Title VII), *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (ADA), *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012) (ADEA)).  While separate statutes provide the basis for claims of retaliation, all such claims are evaluated using the burden-shifting framework of

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kirkland v. Cablevision Sys.*, 760

F.3d 223, 225 (2d Cir. 2014) (Title VII); *Treglia*, 313 F.3d at 719 (ADA); *Terry v. Ashcroft*, 336

F.3d 128, 141 (2d Cir. 2003) (ADEA).

Not only are Title VII, the ADA, and the ADEA all governed by the *McDonnell Douglas*

burden-shifting framework, but the general elements that a plaintiff must show under each statute

are identical.  "A finding of unlawful retaliation is not dependent on the merits of [any]

underlying discrimination complaint."  *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir.

1986) (collecting cases).  Rather, in order for a plaintiff "to state a *prima facie* case of retaliation

[under Title VII], a plaintiff must show that (1) she engaged in protected activity; (2) the

defendant knew of this protected activity; (3) she suffered an adverse employment action; and

(4) a causal connection exists between the protected activity and the adverse employment

action."  *Dickens v. Hudson Sheraton Corp.*, No. 16cv969, 2017 WL 1755941, at *1 (2d Cir.

May 4, 2017) (citing *Littlejohn*, 795 F.3d at 315-16); *Kessler v. Westchester Cty. Dep't of Social

Servs.*, 308 F. App'x 528, 529 (2d Cir. 2009) (summary order) (applying same standard to

ADEA retaliation claim); *Treglia*, 313 F.3d at 719 (applying same standard to ADA retaliation

claim); *Palummo v. St. Vincent's Medical Ctr.*, 4 F. App'x 99, 102 (2d Cir. 2001) (summary

order) (applying same standard to both ADA and ADEA retaliation claims).

Filing of an EEOC complaint constitutes "opposition" to unlawful employment practices,

and thus constitutes "protected activity" under all three statutes.  *See Betterson v. HSBC Bank

USA, N.A.*, 661 F. App'x 87, 89 (2d Cir. Sept. 22, 2016) (summary order); *Kouakou v.

Fideliscare N.Y.*, 920 F. Supp. 2d 391, 399 (S.D.N.Y. 2012).  Filing of a federal lawsuit also

constitutes "opposition" to unlawful employment practices, and thus also constitutes "protected

activity" sufficient to support claims of retaliation.  *See Dotson*, 2017 WL 1437131, at *3.

As to the causation element, and unlike with employment discrimination claims, "[i]t is not enough that retaliation was a 'substantial or 'motivating' factor in the employer's decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (citation omitted). Rather, "for an adverse retaliatory action to be 'because' a plaintiff [engaged in protected activity]," the plaintiff must show "that the retaliation was a 'but-for' cause of the employer's adverse action." *Id.* (citation omitted); *see also Riddle v. Citigroup*, 640 F. App'x 77 (2d Cir. 2016) (summary order).

A plaintiff's burden at the *prima facie* stage "has been characterized as 'minimal' and '*de minimis*.'" *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (citations omitted). Nontheless, "the plaintiff must proffer at least competent evidence of circumstances that would be sufficient to permit a rational trier of fact to infer a discriminatory [or retaliatory] motive" for the employer's actions. *Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, 955 F. Supp. 2d 118, 128 (E.D.N.Y. 2013) (applying this standard in an ADEA retaliation case) (citing *Cronin v. Aetna Life Ins.*, 46 F.3d 196, 204 (2d Cir. 1995)); *see also Smiley v. Cassano*, No. 10cv3866 (RJS), 2017 WL 967436, at *4 (S.D.N.Y. Mar. 21, 2012) (applying identical standard in ADA retaliation case); *Martinez-Santiago v. Zurich N. Am. Ins. Co.*, No. 07cv8676 (RJS), 2010 WL 184450, at *10 (S.D.N.Y. Jan. 20, 2010) (applying identical standard in Title VII retaliation case). Even in the context of retaliation claims, though, the applicable "but-for" causation element for a *prima facie* case "can be shown indirectly by timing:  protected activity followed closely in time by adverse employment action." *Vega*, 801 F.3d at 90-91 (citations omitted).

Under each of the relevant statutes, pursuant to the *McDonnell Douglas* burden-shifting framework, once a plaintiff has made her requisite showing, "the burden of proof shifts to the

employer and require[s] the employer to come forward with justification for the adverse employment action against the plaintiff." *Littlejohn*, 795 F.3d at 307 (internal quotation marks and citations omitted). In other words, if the plaintiff makes her *de minimis* showing, then a presumption of retaliation is created, and, to rebut the presumption, the employer must articulate some legitimate, non-retaliatory reason for the adverse action taken against the plaintiff. *Dotson*, 2017 WL 1437131, at *3 (Title VII retaliation case). The employer's burden, in this regard, is not to prove, conclusively, that the proffered reason was the actual reason for the adverse action, but rather simply to undercut the plaintiff's *prima facie* case "through the introduction of admissible evidence" of legitimate reasons for the adverse action taken against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981) (employment discrimination case); *see also Bucalo*, 691 F.3d at 128 (applying standard to Title VII retaliation claim and noting that standards set forth in *Burdine* apply in the context of Title VII and other retaliation claims).

If a defendant in fact proffers a permissible justification for any adverse employment action it took, "the burden returns to the plaintiff to demonstrate that the proffered reason was not the true reason (or in any event not the sole reason) for the employment decision, which merges with the plaintiff's ultimate burden of showing that the defendant intentionally discriminated [or retaliated] against her." *Jute*, 420 F.3d at 173 (internal quotation marks and citations omitted) (applying standard in Title VII retaliation case). "The plaintiff's burden at [this stage] is substantially higher than the burden at the first stage," *i.e.*, the plaintiff's initial showing of a *prima facie* case of retaliation. *Lore v. City of Syracuse*, 583 F. Supp. 2d 345, 365 (N.D.N.Y. 2008) (citing *Meiri v. Dacon*, 759 F.2d 989, 996 n.10 (2d Cir. 1985)). Ultimately, a plaintiff must show that a defendant's proffered reason for any adverse employment action is

pretextual, "either directly by persuading the court that a discriminatory [or retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Burdine*, 450 U.S. at 256; *see also Bucalo*, 691 F.3d at 128 (applying standard to Title VII retaliation claim).  Once a defendant has met its burden, to avoid summary judgment, a plaintiff need not show that a retaliatory motive was the only reason for the defendant's adverse action, but "must . . . demonstrate the existence of a genuine issue of material fact on the question of whether defendants intended to retaliate against [her]." *Naftchi v. N.Y.U.*, 14 F. Supp. 2d 473, 498 (S.D.N.Y. 1998).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff remains at all times with the plaintiff."  *Burdine*, 450 U.S. at 253; *see also Bucalo*, 691 F.3d at 128.

An extra measure of caution is needed in "granting summary judgment to an employer where, as here, its intent is at issue."  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).  An employer's records will rarely document the state of mind or motives of its decision-makers, and therefore materials "must be carefully scrutinized for circumstantial evidence that could support an inference of discrimination [or retaliation]."  *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996); *see also McFadden v. Cty. of Monroe*, 672 F. App'x 81, 84 (2d Cir. 2016) (summary order) (stating that "a retaliation plaintiff may also satisfy the causation or motive element by presenting a convincing mosaic of circumstantial evidence that would support the inference that retaliation was at work" (internal quotation marks and citation omitted)).  Nonetheless, "summary judgment remains available for the dismissal of discrimination [or retaliation] claims in cases lacking genuine issues of material fact."  *Quarless v. Brooklyn Botanic Garden Corp.*, No. 11cv05684 (CBA) (RER), 2014 WL

2767085, at *4 (E.D.N.Y. June 18, 2014) (alteration in original) (quoting *Schiano v. Quality*

*Payroll Sys., Inc.,* 445 F.3d 597, 603 (2d Cir. 2006)); *Elmessaodi v. Mark 2 Rest. LLC*, 2016 WL

4992582, at *5 (S.D.N.Y. Sept. 15, 2016) ("the salutatory purposes of summary judgment –

avoiding protracted, expensive, and harassing trials – apply no less to discrimination [and

discriminatory retaliation] cases than to . . . other areas of litigation) (alteration in original)

(quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)).

### D.   "Adverse Employment Actions"
### Under Title VII, the ADA, and the ADEA

As noted above, each of the statutes applicable to this case prohibits an employer from

taking a discriminatory or retaliatory "adverse employment action" against an employee.  As

relevant to Plaintiff's claims, the breach of either of two distinct types of preliminary

employment agreements may constitute an adverse employment action.  Additionally, failing to

hire a potential employee may also, under certain circumstances, constitute such an action.

### 1.   Breach of Preliminary Employment Agreement

Preliminary agreements are a certain "class of agreements," by which parties "'provide

for the execution of more formal agreements.'"  *Vacold LLC v. Cerami*, 545 F.3d 114, 124 (2d

Cir. 2008) (quoting *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 547 (2d Cir.

1998)).  "Under New York law, ordinarily, where the parties contemplate further negotiations and

the execution of a formal instrument, a preliminary agreement does not create a binding

contract."  *Id.* (internal quotation marks and citations omitted).  "'In some circumstances,

however, preliminary agreements can create binding obligations.'"  *Id.* (quoting *Adjustrite*, 145

F.3d at 548).  Failing to honor a binding, preliminary employment agreement can constitute an

adverse employment action.  *Cf. Leibowitz v. Cornell Univ.*, 584 F.3d 487, 506-07 (2d Cir. 2009)

(assuming, in context of an ADEA discrimination claim, that employer's failure to honor an

implied agreement to renew an employee's contract would be an adverse employment action, although finding that no such implied agreement existed), *superseded by statute on other grounds*, *see Vogel v. CA, Inc.*, 662 F. App'x 72, 75 (2d Cir. 2016) (summary order); *see also Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (in the retaliation context, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination" (internal quotation marks and citations omitted)).

Under a framework first "articulated by Judge Leval in *Teachers Insurance & Annuity Association v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987)," *Missigman v. USI Ne., Inc.*, 131 F. Supp. 2d 495, 506-07 (S.D.N.Y. 2001), there are two principal categories of preliminary agreements, *see id.* at 507; *see also Vacold*, 545 F.3d at 124.   "The first is a fully binding preliminary agreement, which is created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document."   *Missigman*, 131 F. Supp. 2d at 507 (citing *Adjustire*, 145 F.3d at 548).   "Agreements of this type render the parties 'fully bound to carry out the terms of the agreement even if the formal instrument is never executed.'"   *Vacold*, 545 F.3d at 124 (quoting *Adjustire*, 145 F.3d at 548); *see also Missigman*, 131 F. Supp. 2d at 507.   This first type of agreement may be an "implied-in-fact" contract, in which "the parties' agreement and assent thereto have been manifested by conduct instead of words."   *Bergin v. Century 21 Real Estate Corp.*, No. 98cv8075 (JGK), 2000 WL 223833, at *9 (S.D.N.Y. Feb. 25, 2000) (internal quotation marks and citation omitted).

"The second type of preliminary agreement, dubbed a 'binding preliminary commitment'
by Judge Leval, is binding only to a certain degree," *Missigman*, 131 F. Supp. 2d at 507,
"because 'the parties agree on certain major terms, but leave other terms open for further
negotiation,'" *Vacold*, 545 F.3d at 124 (quoting *Adjustrite*, 145 F.3d at 548, and citing *Shann v.
Dunk*, 84 F.3d 73, 77 (2d Cir. 1996) ("Type II is where the parties recognize the existence of
open terms, even major ones, but, having agreement on certain important terms, agree to bind
themselves to negotiate in good faith to work out the terms remaining open.")).  In other words,
pursuant to such an agreement, "the parties . . . bind themselves . . . in the sense that they accept
a mutual commitment to negotiate together in good faith in an effort to reach final agreement."
*Tribune*, 670 F. Supp. at 498; *see also Vacold*, 545 F.3d at 124; *Missigman*, 131 F. Supp. 2d
at 507.  Accordingly, "[i]f the parties 'fail to reach . . . a final agreement after making a good
faith effort to do so, there is no further obligation.'"  *Vacold*, 545 F.3d at 124 (quoting *Adjustrite*,
145 F.3d at 548).  This second type of preliminary agreement has sometimes been called an
"agreement to agree," *see, e.g.*, *P.A. Bergner & Co. v. Martinez,* 823 F. Supp. 151, 156
(S.D.N.Y. 1993) (noting that the "parties can fulfill their obligations under this second type of
binding preliminary agreement, and yet not agree on the ultimate written contract, provided good
faith differences in the negotiation of the open issues prevent the parties from reaching a final
contract," and further explaining that, "[i]n effect, an agreement to agree buys a party an
assurance that the transaction will falter only over a genuine disagreement"), although the
"agreement to agree" terminology has not always been given consistent meaning, *see Missigman*,

131 F. Supp. 2d, at 507 (contrasting a preliminary agreement that is a "binding contract" with an "unenforceable agreement to agree").[24]

### 2.   <u>Failure To Hire</u>

Retaliating against an employee by "fail[ing] to hire" him or her also constitutes an adverse employment action.  *See Riddle*, 640 F. App'x at 79.  As set forth above (*see* Discussion, *supra*, at Section I(C)), the same general standards apply to Title VII, ADA, and ADEA claims. A plaintiff must, in particular, show "that:  (1) defendants discriminated – or took an adverse employment action – against [her]," *i.e.*, failed to hire her, "(2) because [s]he has opposed any unlawful employment practice" under the relevant statute.  *Vega*, 801 F.3d at 90.  A plaintiff must also adequately establish causation, showing "a connection between the [adverse] act and h[er] engagement in protected activity."  *Id.*  For retaliation claims, moreover, a plaintiff must show "that the retaliation was the 'but-for' cause of the employer's adverse action, *i.e.*, that the adverse action would not have occurred in the absence of the retaliatory motive."  *Riddle*, 640 Fed. App'x at 79 (internal quotation marks and citation omitted) (applying these standards on a motion to dismiss in the Title VII, ADA, and ADEA failure-to-hire contexts).

Finally, in the failure-to-hire context, a plaintiff must ordinarily show "that she applied for an available position for which she was qualified and was rejected under circumstances

---

[24] When determining "whether the parties to a preliminary agreement that called for execution of a formal instrument intended to be bound in the absence of such an executed final instrument," courts in the Second Circuit consider four factors (the "*Tribune* test"):  "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing."  *Missigman*, 131 F. Supp. 2d at 508-09 (citing *Tribune*, 670 F. Supp. at 499-503); *see also Adjustrite*, 145 F.3d at 549 (citing *Winston v. Mediafare Ent'mt Corp.*, 777 F.2d 78, 80 (2d Cir. 1986) and noting that the four factors are considered when evaluating "an agreement of either the first or the second type").

giving rise to an inference of unlawful discrimination [or retaliation]." *Wang v. Phoenix Satellite Television US, Inc.*, 976 F. Supp. 2d 527, at 537 (S.D.N.Y. 2013) (citing *Burdine*, 450 U.S. at 253). In other words, a plaintiff must demonstrate the existence of "specific positions to which she applied and was rejected," and, "[t]o qualify as an application, a plaintiff's actions must be more than a general request for employment." *Id.* (citing *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998).[25] A narrow exception applies to this "application" requirement, pursuant to which a plaintiff must show "that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 227 (2d Cir. 2004).

## II.     THE PARTIES' MOTIONS

### A.     Plaintiff's Application for a Default Judgment

As part of her cross-motion, Plaintiff argues that a default judgment should be entered against Defendants, based on their purported failure to respond to Plaintiff's Complaint in a timely fashion. (*See* Pl. Mem., at 4-6.) As set out above, Plaintiff contends that, as Defendants stamped the papers served on them by the USMS as having been received on April 21, 2015, that should be considered the date of service, even though Drinan executed and returned the "Acknowledgment of Receipt of Service by Mail" ("Acknowledgement") 28 days later, on

---

[25] Where, as in this case, an individual is hired for an unpaid internship, and then seeks a paid position within the same company or agency, the individual's situation is somewhat akin to that of a lower-level employee, seeking advancement to a better job. Thus, in such a context, a "failure to hire" may be viewed as analogous to a "failure to promote." In failure-to-promote cases, a plaintiff similarly must be able to show that "he or she applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion." *Johnston v. Carnegie Corp. of N.Y.*, No. 10cv1681 (PAC) (DF), 2011 WL 1085033, at *11 (S.D.N.Y. Feb. 24, 2011) (internal quotation marks and citations omitted; collecting cases) (report and recommendation), *adopted by* 2011 WL 1118662 (Mar. 23, 2011).

May 19, 2015.  (*Id.*)  In this regard, Plaintiff appears to contend that Drinan was falsely stating, in the Acknowledgment, that service was *received* by Defendants on May 19, 2015.  Based on this purported falsity, Plaintiff further appears to contend that Defendants were not entitled to the benefit of the extended timeline for responding to a complaint, when served by the USMS by mail, as set out in the Court's Standing Order.  (*Id.*)

Plaintiff's argument lacks any merit.  The Court's Standing Order, a copy of which was submitted by Plaintiff herself (Vlad-Berindan Decl., Ex. 59), states:

> IT IS HEREBY ORDERED that any defendant who returns a completed, dated, and signed Acknowledgement of Receipt of Service by Mail ("Acknowledgment Form") **within thirty days of receiving the form** from the Marshals Service will have *sixty* days from the date the defendant or defendant's agent mails or delivers the completed Acknowledgement Form to the Marshals Service to file and serve an answer or motion in response to the complaint.

(*Id.* (emphasis in boldface added).)  In other words, the Acknowledgment does not need to reflect the date of *receipt* of the form, but rather, to be effective, must be signed, dated, and returned *within 30 days of receipt*.  In this instance, the form signed by Drinan was dated and apparently returned by mail on May 19, 2015, which was within 30 days of April 22, 2015, the stamped date of its receipt.  Thus, under the Standing Order, Defendants had 60 days from May 19, 2015 – or until July 20, 2015 – to move, answer, or otherwise respond to the Complaint.  The Court then granted a request to extend that date to July 23, 2015 (*see* Dkt. 15), and Defendants duly moved to dismiss the Complaint on July 23, 2015 (Dkt. 18).

Accordingly, I recommend that Plaintiff's motion for a default judgment be denied.

**B.      The Parties' Cross-Motions for Summary Judgment**

At this juncture, Plaintiff's only surviving claims are for retaliation, brought under Title VII, the ADA, and the ADEA.  (*See generally* Dkt. 46.)  Both Defendants, by their motion, and Plaintiff, by her cross-motion, have sought summary judgment in their favor on these claims.

**1.      Inadequacy of the Parties' Submissions**

As a threshold matter, this Court notes that the parties' summary judgment submissions are deficient in numerous respects.  First, Plaintiff has failed to comply fully with Rule 56(c)(1)(A), as many of her supposed factual assertions are wholly unsupported, are supported only by evidence that is not in admissible form, or are best characterized as rambling insinuations or accusations directed at either Defendants or the Court.  (*See, e.g.*, Pl. 56.1 Stmt. ¶ 64 (stating that the Honorable Judge James C. Francis, IV, U.S.M.J., issued a certain Order in the Prior Action "[b]ecause [he] appeared to have a wrong preconceived idea[] that a poor person must be a stupid one who lives in misery").)  Plaintiff has also failed to comply fully with Local Civil Rule 56.1, as, in the statement she filed in response to Defendants' Rule 56.1 Statement, she asserts, *inter alia*, that most of Defendants' statements are "vague and ambiguous" and "irrelevant," rather than "specifically controvert[ing]" Defendants' statements with admissible evidence, as required.  (*See generally* Pl. 56.1 Stmt. Opp.; *see also* Local Civil Rule 56.1(c)-(d).)  Defendants, for their part, have submitted no opposition at all to the Rule 56.1 Statement filed by Plaintiff in support of her cross-motion.

Further, Plaintiff's Rule 56.1 Statement, her declaration attaching exhibits in support of that statement, and her opposing statement raise dozens of arguments (or, often, generalized complaints) that have already been fully litigated or are not appropriately presented on summary judgment, and that, in any event, are untimely, without merit, or both.  (*See, e.g.*, Pl. 56.1 Stmt.

¶ 232 (requesting that this Court's Order, dated October 7, 2016 (Dkt. 81) be "set aside/voided in its entirety," in part because this Court recommended that Plaintiff consult with the *Pro Se* Office should she need assistance in understanding this Court's Order); Vlad-Berindan Decl. ¶ 89 (noting attachment of the Individual Practices and Procedures of the Honorable Frank Maas, U.S.M.J., as Ex. 89, and complaining that those procedures "express[] [his] obvious disregard and dislike of self-represented litigants"); Pl. 56.1 Stmt. Opp. ¶ 2 (seeking untimely "reconsideration" of the Court's April 1, 2016 Opinion and Order (Dkt. 46), dismissing Plaintiff's Fair Labor Standards Act claim).)  Plaintiff has also unnecessarily submitted, as exhibits, dozens of court documents appearing on the Docket of this action, as well as exhibits that have no conceivable relevance to the retaliation claims at issue here.  For example, Plaintiff has included 19 AFDRs that, she contends, "would be offered to prove the truth" of her allegations that NYCTA hiring managers selected "candidates for being hired based on Ethnicity/color, gender," and other impermissible factors, despite the fact that no claims of discrimination based on national origin, race, or gender survive in this case.  (*See* Vlad-Berindan Decl. ¶ 52 & Ex. 52.)

In light of these issues, and as noted above (*see supra*, at n.2), this Court has turned to the discovery record itself, read in conjunction only with statements of relevant fact contained in the parties' submitted affidavits and declarations, to determine whether genuine, disputed issues of material fact should preclude summary judgment from being entered on either party's behalf.

## 2.  Plaintiff's Application To Strike Her Deposition Testimony in Connection with the Motions

As another preliminary matter, this Court turns to Plaintiff's request that, in its review of the record, the Court disregard her deposition testimony as improperly obtained.  As mentioned above (*see* Background, *supra*, at Section B(3)), Plaintiff challenges the admissibility of her

testimony on three separate grounds.  First, she contends that her deposition testimony is

inadmissible because Magistrate Judge Maas had ordered that any statement in the deposition

transcripts indicating that the testimony had "been taken pursuant to Court Orders" was to be

"deemed stricken" (Dkt. 72), and yet those transcripts, as submitted by Defendants in connection

with their summary judgment motion, still contain language to that effect (Pl. Mem., at 14).  This

challenge to Defendants' use of the transcripts for purposes of their motion is plainly meritless,

as Judge Maas ordered only that any references to the deposition being taken pursuant to Court

Orders be "*deemed*" stricken from the transcripts, not that the references be physically deleted.

Second, Plaintiff contends that the deposition transcripts are inadmissible because she

refused to sign them.  (Pl. Mem., at 14.)  This argument, too, lacks merit.  As Defendants point

out (Def. Reply, at 3-4), Rule 30(e) of the Federal Rules of Civil Procedure does not mandate

signature by the deponent, but rather requires, only upon "request by the deponent . . . before the

deposition is completed," that the deponent be afforded a 30-day period in which to review the

transcript, and, if the deponent wishes to make any changes, that the deponent "sign a statement

listing the changes and the reasons for making them."  Thus, under the Federal Rules, "[t]he fact

that [a] [p]laintiff did not sign the deposition transcript[s] does not . . . make [the testimony]

inadmissible, as a deponent is required to sign the deposition transcript only if review of the

transcript is requested before the deposition is completed and changes are made by the

deponent."  *Merring v. Town of Tuxedo, N.Y.*, No. 07cv10381, 2009 WL 849752, at *1

(S.D.N.Y. Mar. 31, 2009) (internal quotations and citation omitted).  In this case, Plaintiff has

offered no evidence that she timely requested an opportunity to review the transcripts, or that she

identified any specific changes that she wished to make to the deposition transcripts.

Finally, Plaintiff contends that her testimony is inadmissible (and unreliable) due to the stress she experienced during her deposition, and "the influence of strong medicine for arrhythmia and pain."  (Pl. Mem., at 15-16.)  Although there is a relative dearth of authority on this subject, here, too, Plaintiff's argument is flawed.  In *Cordius Trust v. Kummerfeld*, the court was tasked with deciding whether a witness was incompetent at the time she was deposed, such that her deposition testimony should be held inadmissible.  No. 99cv3200 (DLC), 2008 WL 113683, at *1 (S.D.N.Y. Jan. 10, 2008).  As noted by the court, pursuant to Federal Rule of Evidence 601, "questions concerning the competency of witnesses are . . . governed by New York law."  *Id.*, at *3.  Under New York law, the test for competency "'is whether the prospective witness has sufficient intelligence to understand the nature of any oath and to give a reasonably accurate account of what [she] has seen and heard.'"  *Id.* (quoting *People v. Parks*, 359 N.E.2d 358, 366 (N.Y. 1976)).  Although "[t]he New York Court of Appeals has never squarely ruled on the issue" of what considerations should form a part of that competency test, "[p]resumably, the court's inquiry would be whether, at the time [of the deposition], [the deponent] had 'sufficient intelligence' to understand the nature of [the deposition] oath and to give a reasonably accurate account of the facts" about which he or she is being questioned.  *Id.*

In this case, there is absolutely no evidence that Plaintiff lacked "sufficient intelligence" to appreciate the nature of her oath or to give reasonably accurate testimony.  Throughout the course of this case, Plaintiff has evinced a substantial level of intelligence.  Indeed, even though her cross-motion for summary judgment is off-the-mark at times, it is understandable in its key points, and this Court notes that it was put together without the assistance of counsel.  Further, on a thorough review of the deposition transcripts, this Court finds nothing to suggest that Plaintiff was so incapacitated by her stress or medications that she could not understand or respond to the

questions posed to her.  To the contrary, Plaintiff's deposition testimony suggests that Plaintiff

was well aware of what she was being asked, and was able to respond adeptly.  (*See, e.g.*,

Gallagher Decl., Ex. T, at 43 (Plaintiff objecting to question because it had been asked "for the

third or fourth time"); *cf. Cordius Trust*, 2008 WL 113683, at *3 ("Moreover, the designated

deposition excerpts have been examined by the Court with care, and they reflect no mental

infirmity or incompetence on the part of [the deponent].").)

For these reasons, Plaintiff's deposition testimony should be considered admissible for

purposes of summary judgment, and the substance of that testimony should thus be considered

by the Court, along with the other evidence in admissible form that has been submitted by the

parties.

### 3. Plaintiff's Retaliation Claims

Construing Plaintiff's submissions liberally in light of her *pro se* status, and "interpreting

them to raise the strongest arguments that they suggest," *Burgos v. Hopkins*, 14 F.3d 787, 790

(2d Cir. 1994) (citations omitted), this Court discerns two separate and distinct legal theories

upon which Plaintiff may be attempting to claim unlawful retaliation under the relevant civil

rights statutes.

First, Plaintiff may be claiming that the retaliation against her took the form of a failure

by NYCTA to honor a purported unwritten agreement to hire her, or to consider hiring her, as a

paid paralegal consultant.  From her submissions on the pending motions, it certainly appears

that Plaintiff is asserting that, at the very outset of her internship with NYCTA, the parties

entered into a fully negotiated and binding preliminary agreement (*i.e.*, a complete oral or

implied-in-fact agreement, which, presumably, was eventually to be memorialized in writing)

that she would transition from the internship to a paid paralegal consultant position, but that

NYCTA unlawfully reneged on that agreement when it learned of Plaintiff's filing of the Prior

Action.  As a variant of this theory, Plaintiff may alternatively be asserting that NYCTA had

assented to a preliminary "commitment" to hire her for a paralegal consultant position, *i.e.*, that,

orally or as evinced by conduct, NYCTA had agreed that Plaintiff would serve as an intern, and

that, at some point after the commencement of the internship, the parties would negotiate in good

faith to finalize the terms of a paid position, but NYCTA, for retaliatory reasons, failed to engage

in such good-faith negotiations.  In either of these agreement-based scenarios, the "adverse

employment action" element of Plaintiff's retaliation claims could be satisfied by proof of

NYCTA's failure to abide by its contractual obligations.

Second, Plaintiff may simply be contending that, in retaliation for her protected activity,

NYCTA failed to hire her for an open paralegal consultant position, despite her availability at the

approximate time that position opened up, her relevant experience and qualifications, the high-

quality work she claims to have performed as an intern, and her supposedly known interest in the

paid position.

This Court will address, in turn, whether the factual record presented on summary

judgment is capable of supporting either of these types of retaliation claims.

### a.      Retaliatory Failure To Honor a Preliminary Agreement To Hire Plaintiff or To Commit To Negotiating an Employment Agreement in Good Faith

Although Plaintiff's submissions are far from precise, both she and Defendants appear to

focus their summary judgment arguments on the first of the potential theories described above, in

that most of their briefing seems dedicated to the question of whether the evidence of record is

capable of establishing the existence of a binding preliminary agreement by NYCTA to employ

Plaintiff as a paid paralegal consultant.  (*See, e.g.*, Pl. Mem., at 2 (discussing the facts of the case

in terms of offer, acceptance, and mutual agreement); Def. Mem., at 13-16 (discussing the legal

standards for creation of a contract).)  On their motion, Defendants primarily contend that, absent

evidence of such an agreement, Plaintiff could have no basis for proceeding to trial on a claim

that NYCTA took an unlawful adverse action against her by failing to honor the agreement.  (*See*

Def. Mem., at 17.)  On this point, Defendants argue persuasively that the evidence developed

through discovery is insufficient either to demonstrate the existence of a binding preliminary

agreement, or even to raise a genuine disputed issue of fact as to the existence of such an

agreement, such that a trial would be warranted.  (*See id.*, at 17-20.)

     As noted above, an otherwise complete binding preliminary agreement, not yet

memorialized in an executed writing, may be oral or may be an "implied-in-fact" contract, in

which the parties' "agreement and assent thereto have been manifested by conduct instead of

words."  (*See* Discussion, *supra*, at Section I(D)(1) (quoting *Bergin*, 2000 WL 223833, at *8).)

In the latter instance, the parties' conduct must have been sufficiently unequivocal that, even

though the agreement was not expressed in words, "a court may justifiably infer that the promise

would have been explicitly made, had attention been drawn to it."  *Nat'l Gear & Piston, Inc. v.*

*Cummins Power Sys.*, *LLC*, 861 F. Supp. 2d 344, 359 (S.D.N.Y. 2012) (internal quotation marks

and citation omitted).  Like any contract, an implied-in-fact agreement "requires such elements

as consideration, mutual assent, legal capacity and legal subject matter," and, "[u]nder settled

law," no contract will be found to have been formed if the evidence does not show it to have

been "reasonably certain in its material terms."  *Id*. (internal quotation marks and citations

omitted).  "In determining whether the parties' conduct is consistent with the existence of a

binding contract, it is necessary that the totality of all acts of the parties, their relationship and

their objectives be considered."  *Id.* (internal quotation marks and citation omitted).

In this case, even drawing all inferences in Plaintiff's favor, the evidence she has proffered is insufficient to show – from the parties' words, relationship, or actions – that there was ever mutual assent to the alleged hiring agreement.  Material terms of an employment agreement under New York law include compensation and duration.  *Zaitsev v. Salomon Bros.*, 60 F.3d 1001, 1004 (2d Cir. 1995) (citation omitted).  Here, as to compensation, Plaintiff testified at her deposition that, at the time paid employment was impliedly discussed (*i.e.*, on her initial telephone call with Waters on February 13, 2014, and during her interview on March 7, 2014), she was told that the paralegal position paid $10.00 per hour.  (*See, e.g.*, Gallagher Decl., Ex. T, at 46:21-25; 81:15-17; 87:9-21; 138:12-17.)  This, therefore, was presumably the amount Plaintiff is claiming that she agreed to be paid, when she purportedly accepted NYCTA's offer of employment on March 10, 2014.  (*See* Pl. 56.1 Stmt. ¶ 312.)  Yet, it seems that, after having been later provided with evidence that paralegal consultants were routinely paid more than this, Plaintiff has now surmised that what was meant by "$10.00 per hour" was actually $14.50 per hour, and that those who purportedly mentioned the $10.00 figure to her must have been assuming that, with deductions, $14.50 per hour would translate to approximately $10.00 per hour in take-home pay.  (*See, e.g.*, *id.* ¶¶ 57 n.2 & 315.)  Such surmise cannot satisfy the requirement that the material terms of a contract be agreed with definiteness.  *Cf. Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 515 (S.D.N.Y. 2012) (where plaintiff "described the statements upon which he inferred an oral [employment] agreement in elusive and vague terms," no "reasonable fact-finder [could find] a promise sufficiently concrete to be enforceable").

As for the term of her supposed agreed employment, Plaintiff proffers no evidence that she was ever told a start or end date for the paralegal consultant position that she believed she would be given.  *Cf. Naser v. Ravago Shared Servs. LLC*, No. 3:10CV573 WWE, 2012 WL

669053, at *2-3 (D. Conn. Feb. 27, 2012) (verbal representations made by defendant, suggesting plaintiff would be employed through end of calendar year, spoke to material term (duration) and were sufficient to preclude summary judgment).  Nor does the record reflect evidence of any conduct by her supervisors at NYCTA capable of suggesting that they had assented to Plaintiff's commencing a paid position at the end of her six-week internship.  To the contrary, there is a complete absence of evidence that NYCTA took any steps that would have been consistent with bringing Plaintiff onto its payroll on such a schedule.[26]

In any event, even if Plaintiff could demonstrate that the pay rate and duration of the paralegal consultant position were standardized and non-negotiable, what is missing from the record is *any* non-speculative evidence that NYCTA *assented to hire Plaintiff* for a paid position, at all.  "[C]ourts must be wary of trapping parties in surprise contractual obligations that they never intended to undertake."  *Missigman*, 131 F. Supp. 2d at 507 (internal quotation marks and citations omitted).

In this case, each of the conversations and interactions with Waters and Redmond-Smith relied upon by Plaintiff to show NYCTA's assent occurred in the specific context of Plaintiff's having stated that she needed to secure and complete an *internship*, as a requirement for her educational program.  In that context, any general statements by Waters or any interviewers

---

[26] The record also reflects a lack of definiteness as to the hours that Plaintiff purportedly agreed to work in a paid position.  As noted above, Defendants have shown that postings for paralegal consultant positions may list different required hours.  (*See* Gallagher Decl., Ex. P (showing postings for one position requiring "approximately 23-28 hours per week," and for another requiring "approximately 35 hours per week").)  Wheatle had apparently worked 35 hours per week (*see* Vlad-Berindan Decl., Ex. 48, at 11, 15, 19), but, as noted above, Plaintiff has testified that, when an interviewer requested that she work five days per week, she responded that "she could only work three days per week while a student, and that, after the school year was over, she would "*probably*" be able to work full time (Gallagher Decl., Ex. T, at 100 (emphasis added)).

regarding the possibility of paid employment cannot manifest NYCTA's assent to an agreement to provide such employment.  *See*, *e.g.*, *Sava v. Gen. Elec. Co.*, 877 F. Supp. 81, 85 (D. Conn. 1995) (noting that general statements regarding the possibility of a plaintiff's employment – concerning, *e.g.*, her "imagination," "willingness to work," and describing a policy of incentive compensation for doing "a good job" – "are not . . . sufficiently definite to create an implied-in-fact contract").  Plaintiff's testimonial evidence that a secretary, with no apparent job duties implicating NYCTA's hiring policies or decision-making, often would joke with Plaintiff, using the phrase "intern to perm"  (Gallagher Decl., Ex. T, at 132), amounts to evidence of mere "hearsay statements or rumors" that cannot "create a material issue of fact" as to the existence of a binding employment agreement between Plaintiff and NYCTA, *see Leibowitz*, 584 F.3d at 508 ("hearsay statements or rumors" regarding Cornell University employment policies "recounted in discovery by certain Cornell employees [were] insufficient to undermine the explicit terms of plaintiff's appointment letters and Cornell policy").

Further, Plaintiff has made no showing of conduct by the parties sufficient to create an implied-in-fact contract.  Plaintiff states that she "assumed" that she would be hired permanently, based upon "the work [she] received from attorneys," as well as the facts that NYCTA had placed a placard with her name on it on her workspace, assigned Plaintiff a work e-mail address, and granted her full access to NYCTA files.  (Gallagher Decl., Ex. T, at 132.)  Other than Plaintiff's speculation that this conduct evinced an intent to treat her like "an employee" (*id.*), though, Plaintiff has not shown that other individuals who served only as interns received some lesser level of work, or did not receive placards, e-mail addresses, or file access.[27]  Plaintiff also

---

[27] The same is true with respect to Plaintiff's assertion that her orientation as an intern was "like a pro and not for [an] intern-learner" (Vlad Berindan Decl. ¶ 28); she offers no

points to documentary evidence in which Redmond-Smith and others used the term "work" to describe Plaintiff's goals and activities (*see, e.g.*, Vlad-Berindan Decl. ¶ 26 & Ex. 26 (attaching Redmond-Smith's interview notes and emphasizing notation (not emphasized in the notes themselves) that Plaintiff was "looking for pre-trial **work**"); *see also id.*, Ex. 28 (internal e-mail from Redmond-Smith to Waters, dated Mar. 11, 2014, indicating that Plaintiff would be "working" for certain periods with certain team members); Pl. 56.1 Stmt. ¶¶ 313, 319, 320 (emphasizing that Redmond-Smith's e-mail did not refer to Plaintiff "interning" or "learning" from these individuals, but rather, to "working" with them)), but these uses of the words "work" or "working," where it is undisputed that Plaintiff at least interned with NYCTA, are far too vague to show that the parties had agreed that Plaintiff would eventually serve in a paid role.

Indeed, much of Plaintiff's own testimony cuts against any argument that a binding agreement to hire her as a paid paralegal consultant existed. For example, Plaintiff testified that she brought an "internship employer packet" of blank forms to her March 7, 2014 interview, which needed to be completed to satisfy her City Tech internship requirements (*id.*, at 57-58), and which hardly evinces, even on Plaintiff's part, an intent to enter into an employment agreement with NYCTA. Plaintiff's deposition testimony also undercuts any assertion that Waters or anyone else at NYCTA ever verbally offered her a paid position. To the contrary, Plaintiff testified that, during their February 13, 2014 telephone call, Waters "couldn't offer . . . a job," or even the internship position, after only a brief conversation and "before she had [Plaintiff's] resume." (Gallagher Decl., Ex. T, at 89.) As to Plaintiff's interview with Waters, Redmond-Smith, and others on March 7, 2014, Plaintiff testified, again with respect to either an

---

evidence that there were separate types of orientations designed for interns and for paid paralegal consultants, and that she was specifically given the type designed for the latter.

internship or a paid position, that she was "not offered anything clearly," and that she "was told that they [were] going to talk and they [were] going to inform me about their position." (*Id.*, at 105.)  According to Plaintiff, Redmond-Smith then telephoned her on March 10, 2014, to inform her that she was "accepted to be an *intern*." (*Id.*, at 59 (emphasis added).)  Although Plaintiff attempts to back away from her testimony on these points, she cannot contradict her own sworn testimony in a Declaration or Rule 56.1 Statement, and thereby manufacture a genuine issue of material fact regarding whether NYCTA had offered her a future position as a paralegal consultant.  *See, e.g.*, *Elhannon LLC v. F.A. Bartlett Tree Expert Co.*, No. 2:14cv262, 2017 WL 3309692, at *7 (D. Vt. Aug. 2, 2017) ("[A] party cannot create a dispute of fact by making a statement in deposition testimony . . . which he or she later contradicts through affidavits provided to avoid summary judgment." (citing *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)).

At most, Plaintiff has put forward her own statements that she was told of an opening for a paralegal consultant, that she was told that the position would pay $10 per hour, and that she sent Waters her resume, showing that she was qualified for the job.  Certainly, none of this constitutes words or conduct, on NYCTA's part, evidencing its intent to be bound by an agreement to hire Plaintiff for a paid position.

Even if this Court were to interpret Plaintiff's claims as asserting only that NYCTA had made a preliminary commitment to negotiate the terms of a paid position,[28] Plaintiff's retaliation claims would fail for lack of evidence of mutual assent to the supposed commitment.  As noted

---

[28] Although neither party explicitly addresses whether an agreement to negotiate in good faith was formed, Plaintiff, at times, frames her submissions around such a concept.  (*See, e.g.*, Pl. 56.1 Stmt. ¶ 6 (asserting that it was only upon learning of the Prior Action that NYCTA's "paralegals hirer did not pursue the next steps for hiring Plaintiff as a paralegal-contractor after the internship," "as Defendant NYCTA did with other interns before"); *see also id.* ¶ 88.)

above, it is possible that Plaintiff may be attempting to claim that the parties had agreed that she would initially serve as an intern and that the parties would then "make a good faith effort to negotiate and agree upon the open terms and a final agreement" for a paid position, *see, e.g.*, *Missigman*, 131 F. Supp. 2d., at 507, but that NYCTA failed to follow through with such negotiation, for retaliatory reasons.  The submitted evidence, however, does not support such a theory for many of the same reasons discussed above, and also in light of the timing of when, according to Plaintiff, NYCTA learned of her protected activity, purportedly triggering the retaliation.

Plaintiff contends that NYCTA did not learn of her Prior Action until April 22, 2014, very close in time to when her internship ended.  Yet, if this were true, and if it were also true that learning of the Prior Action is what caused NYCTA to refuse to follow through on an initial commitment to consider Plaintiff for a paid position, then the record should logically reflect conduct by NYCTA, *before* April 22, consistent with its supposed commitment.  In other words, if NYCTA had initially agreed to negotiate and agree on the terms of a paralegal position for Plaintiff, then – given the potentially lengthy period that would have been needed to process Plaintiff for that position – Waters or Plaintiff's other supervisors should have begun taking steps, well before April 22, to move forward with Plaintiff's hiring, at least by asking for, and checking, Plaintiff's references.  (*See* Def. 56.1 Stmt. ¶¶ 123-24; *see also* Waters Aff. ¶¶ 11-12 (noting that employment candidates selected for initial interviews are required to provide references, which are then checked prior to any call-back interviews).)  There is no evidence in the record that Plaintiff was ever asked to provide references, or that, at any time after her internship began, NYCTA took any other steps to negotiate the terms of a paid position, or to advance the process of hiring her for such a position.

Accordingly, to the extent Plaintiff seeks to proceed on her Title VII, ADA, and ADEA retaliation claims based on Defendants' purported failure to honor a preliminary agreement either to hire her for a paid paralegal consultant position, or to negotiate with her in good faith for such a position, I recommend that Defendants be granted summary judgment dismissing Plaintiff's claims.

### b. Retaliatory Failure To Hire Plaintiff <br> for an Open Paralegal Consultant Position

Neither party devotes significant attention to the question of whether Plaintiff should be permitted to proceed to trial based on a straight, failure-to-hire theory, *i.e.*, not a theory based on any failure by NYCTA to honor a supposed agreement to hire Plaintiff, but simply one whereby Defendants refused to hire her for an available position, for retaliatory reasons. Nonetheless, given the Court's obligation to construe Plaintiff's arguments liberally, this Court will consider whether the evidence she has put forward could support a retaliation claim based on a failure-to-hire theory, under any of the civil rights statutes at issue.

As set out above (*see* Discussion, *supra*, at Section I(C)), a plaintiff seeking to proceed to trial on a Title VII, ADA, or ADEA retaliation claim must first come forward with competent evidence capable of establishing a *prima facie* case. In the failure-to-hire context, this means that a plaintiff must be able to demonstrate, by a preponderance of the evidence, that he or she (1) participated in a "protected activity" and (2) suffered an "adverse employment action," and (3) that a "but-for" causal connection existed between the two. *Vega*, 801 F.3d at 90. Here, it is undisputed that Plaintiff can meet the first prong of the *prima facie* case, as there is no question that her filing of a prior EEOC charge and the Prior Action constituted "protected activity." *See Betterson*, 661 F. App'x at 89; *Dotson*, 2017 WL 1437131, at *3. It is far less clear, however,

that she can meet the second prong of that test – *i.e.*, that she suffered the requisite "adverse employment action."

Defendants, as discussed above, take the position that Plaintiff was never even offered a paid paralegal consultant position, and thus would readily admit that she was never hired for such a position.  The bigger question here is whether, with the benefit of every reasonable inference, Plaintiff's submitted evidence could show that she ever *applied* for *a specific open position*, for which she was then rejected.  *See Wang*, 976 F. Supp. 2d at 537 (noting, in context of a motion to dismiss a retaliation claim, that a plaintiff must plead that she "applied for an available position for which she was qualified"); *see also* Discussion, *supra*, at Section I(D)(2) and n.25.  Plaintiff may be able to demonstrate that she was qualified for a paid paralegal position,[29] but, absent a showing that a particular position was available and that she applied for it, Plaintiff cannot demonstrate that any failure to hire her for a position is actionable.  *See Wang*, 976 F. Supp. 2d at 537 (noting that a "general request for employment" is insufficient).

As set out above, an employee in a failure-to-hire case may only avoid the requirement that he or she formally apply for a specific vacant position where:  "(1) the vacancy at issue was

---

[29] From the paralegal consultant job postings submitted by Defendants, it appears that a paralegal consultant position required "at least 64 credits, an Associates Degree, or a Paralegal Certificate" (Gallagher Decl., Ex. P), and it is undisputed that, by the time of her internship, Plaintiff had completed a paralegal associate's degree at LaGuardia Community College (Gallagher Decl. Ex. T, at 26-27).  Moreover, Plaintiff had also completed at least one paralegal internship at a law firm (*id.*, at 38), and performed satisfactorily in her internship at NYCTA (Vlad-Berindan Decl., Ex. 29; Gallagher Decl., Ex. L).  Indeed, on the evaluation form, Redmond-Smith indicated that she would recommend Plaintiff for employment by NYCTA or others.  (Vlad-Berindan Decl., Ex. 29, at 1; Gallagher Decl, Ex. L.)  Further, while Plaintiff's level of education and experience, at the time, did not correspond exactly to other individuals hired as paralegal consultants, it was generally in keeping with those individuals' backgrounds. (*See generally* Vlad-Berindan Decl., Ex. 22, at 2 (showing Tobar's experience); Ex. 24, at 1 (showing Simmons's experience); Ex. 42, at 89 (showing Martinez's experience); Ex. 48, at 1 (showing Wheatle's experience).)

not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled

or (b) attempted to apply for it through informal procedures endorsed by the employer."

*Petrosino*, 385 F.3d at 227.  In this case, Defendants have submitted a sworn affidavit, by a

person with knowledge, that paid paralegal consultant positions were generally posted in

educational institutions, like City Tech, where Plaintiff was still a student, attending class (*see*

Waters Aff. ¶ 8), and Plaintiff has made no suggestion that the position she sought was unposted.

She also has made no argument that she was unaware of the position's availability.  To the

contrary, Plaintiff has testified that she was specifically made aware of the opening for which she

sought to be hired, having been told of the open position by Waters in their telephone call of

February 13, 2014.  (*See* Gallagher Decl., Ex. T, at 46 (Plaintiff testifying that Waters told her

that NYCTA "[had] an opening for a paralegal contractor"); Pl. 56.1 Stmt. ¶¶ 18-19).)

Moreover, Defendants have put forth uncontroverted evidence that, to complete the application

process, applicants selected for interviews were required to supply references, in addition to a

resume (Waters Aff. ¶¶ 11-12), and Plaintiff has offered no evidence that NYCTA ever endorsed

a departure from those requirements.  Under these circumstances, Plaintiff cannot avail herself of

the exception to the requirement that she identify, with specificity, the position she sought, and

show that she took the formal steps necessary to apply for it.

Even with the benefit of every favorable inference, the evidence offered by Plaintiff is

insufficient to show that she applied for a specific open position.  Plaintiff testified at her

deposition to her understanding that the paid position at issue was the one vacated by Wheatle.

(Gallagher Decl., Ex. T, at 193; *see also id*., at 162.)  In her motion papers, though, Plaintiff

asserts that Wheatle "quit her job on March 10, 2014" (Pl. 56.1 Stmt ¶ 23), and further states that

the person whose job she was offered (presumably Wheatle) "was still under a retainer until

April 4, 2014" (*id.* ¶ 72).  In addition, the documentary evidence submitted by Plaintiff herself, regarding Wheatle's departure, shows that Wheatle was not actually terminated until late April of 2014.  (*See* Vlad-Berindan Decl., Ex. 8, at 26.)  It cannot reasonably be found, therefore, that Plaintiff was told of the job opening created by Wheatle's departure when Plaintiff first spoke with Waters on February 13, 2014.  Nor could Plaintiff be found to have applied for that particular position when she e-mailed her resume to Waters that same day.  (*See* Gallagher Decl., Ex. G.)  Nor could Plaintiff be found to have applied for that particular position by interviewing on March 7, 2014.  (*See id.*, Ex. T, at 55-56, 60, 97.)

Further, with respect to her supposed "application" for a paid position, Plaintiff, at most, has testified that she told Waters, in their initial telephone conversation, that she was "interested in having a job," although she was interested in obtaining an internship "first" (Gallagher Decl., Ex. T, at 47), and that she then provided her resume under a cover e-mail that expressly stated that she was "Seeking [a] Paralegal Internship Position" consisting of 120 internship hours (*id.*, Ex. G; Vlad-Berindan Decl., Ex. 4).

Indeed, Plaintiff confirmed in her own testimony that, following her initial, general discussion with Waters, she never once expressed an interest, to anyone, in a paid paralegal consultant position, let alone sought to apply for a particular vacancy.  (*Id.*, at 130.)  This is entirely insufficient, as, "[t]o qualify as an application, a plaintiff's actions must be more than a general request for employment."  *Wang*, 976 F. Supp. 2d 527, at 537 (citing *Brown*, 163 F.3d at 710); *cf. Johnston*, 2011 WL 1085033, at *11 (applying this standard in the failure-to-promote context).  In addition, as noted above, the record contains no indication that Plaintiff ever provided any references, as required by NYCTA as part of the application process for a paid paralegal consultant position.  (Waters Aff. ¶¶ 11-12.)

73

As Plaintiff cannot demonstrate that she formally applied for a particular open position, she cannot show that she suffered an "adverse employment action" when NYCTA failed to hire her for any such position.  In light of this, she cannot even satisfy her burden to make the "minimal" showing necessary to establish a *prima facie* case of a retaliatory failure to hire.[30] Thus, the Court need not go on to consider whether Defendants have put forth a legitimate, non-retaliatory reason for not hiring Plaintiff for a paid position, or whether the evidence is capable of showing that any such reason is pretextual.  In short, Plaintiff's inability to make out a *prima facie* case is fatal to any failure-to-hire claims that she may be attempting to assert under the relevant discrimination laws, and I therefore recommend that, to the extent her papers may be read to raise any such claims, Defendants be granted summary judgment dismissing those claims.

---

[30] Although, as set out above (*see* Background, *supra*, at Section A(7)), the parties argue at some length as to when NYCTA learned of Plaintiff's filing of the Prior Action, which could be relevant to whether, for purposes of a *prima facie* case, Plaintiff could show temporal proximity between her protected activity and any adverse employment action, *see, e.g.*, *Nielsen v. New York City Commission on Human Rights*, No. 94cv6360 (JSR) (JCF), 1998 WL 20004, at *10 (S.D.N.Y. Jan. 20, 1998) (noting that the causation element of a *prima facie* case may be satisfied where the adverse employment action "closely followed" the protected activity), the Court need not address the parties' arguments on this point, as, if Plaintiff cannot demonstrate the requisite adverse employment action, then causation becomes a moot point.

## CONCLUSION

For all of the foregoing reasons, I respectfully recommend that Defendants' motion for summary judgment (Dkt. 105) be granted; that Plaintiff's cross-motion for summary judgment or a default judgment (Dkt. 118) be denied; and that this case accordingly be dismissed with prejudice and closed on the Docket of the Court.[31]

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Valerie E. Caproni, United States Courthouse, 40 Foley Square, Room 240, New York, 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Caproni. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

---

[31] As noted above (*see supra*, at n.1), the Court previously dismissed all claims against the MTA. Thus, if NYCTA's summary judgment motion is granted, no claims would remain against any of the Defendants named in this action, and the case should be closed. If, on the other hand, this Report and Recommendation is not adopted, then the Clerk of Court should be directed to modify the Docket to reflect the earlier termination of Plaintiff's claims against the MTA, *i.e.*, "NYC Metropolitan Transportation Authority."

If Plaintiff does not have access to cases cited herein that are reported only on Westlaw or other computerized databases, she may request copies from Defendants' counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the *pro se* litigant with copies of [cases and other authorities . . . that are unpublished or reported exclusively on computerized databases] as are cited in a decision of the Court and were not previously cited by any party.").

Dated:  New York, New York
August 25, 2017

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

The Hon. Valerie E. Caproni, U.S.D.J.

All parties (via ECF)